Lori DESMARTEAU, Plaintiff,

v.

The CITY OF WICHITA, KANSAS, Defendant.

No. 97–1412–WEB.

United States District Court, D. Kansas.

Aug. 12, 1999.

Marc A. Powell, Elaine M. Reddick, Powell & Brewer, LLP, Wichita, KS, for plaintiff.

Kelly J. Rundell, City of Wichita Law Department, Wichita, KS, for defendant.

### Memorandum and Order

BROWN, Senior District Judge.

This matter is before the court on the defendant's Motion for Summary Judgment (Doc. 48). Both parties have submitted briefs on the motion. The court finds oral argument would not assist in deciding the issues presented.

## I. Factual Background.

Plaintiff, a former police officer of the City of Wichita, alleges a claim against the City for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, together with state law claims of assault, battery, intentional infliction of emotional distress, and negligent retention of an employee. Plaintiff contends she was harassed by a supervising officer and that the City is liable for the harm she suffered as a result of the harassment. She also contends that various employees of the City retaliated against her after she filed complaints with the Equal Employment Opportunity Commission (EEOC) and Kansas Human Rights Commission.

In keeping with the standards governing summary judgment, the following facts are uncontroverted or, when controverted, are viewed in the light most favorable to the plaintiff. Immaterial facts and factual averments not supported by the record are omitted.[1]

1. Plaintiff went through the police academy in 1991 and was a police officer for the City of Wichita.

2. In the Wichita Police Department, the chain of command from bottom to top is as follows: police officer, sergeant, lieutenant, captain, major, colonel (deputy chief), and the chief of police at the top.

3. The City of Wichita has a policy against sexual harassment; it is an administrative regulation of the City.

4. Plaintiff was aware that the City of Wichita had a policy against sexual harassment. Plaintiff attended a Sexual Harassment training class conducted by the City of Wichita's Personnel Office on April 23, 1992. The class covered the City's policy against sexual harassment.

5. Plaintiff was aware that the City of Wichita had an Equal Employment Opportunity (EEO) officer, and knew that her name was "Miss Johnson."

6. The Wichita Police Department's own EEO officers are Becky Miller and Teri Moses.

7. Roger Williamson is the only employee of defendant who ever engaged in conduct Lori Desmarteau believes constituted sexual harassment. The plaintiff alleges that other officers retaliated against her for her reporting of Williamson's alleged conduct.

8. The first incident plaintiff recalls was when Roger Williamson told plaintiff she looked really nice and that he liked redheads. Plaintiff does not recall when or where this happened.

9. Plaintiff never told Roger Williamson she did not like him making such

---

1. Plaintiff's response fails to comply with Local Rule 56.1 in several respects. For example, the response cites several deposition pages that are not attached to her brief. The response also cites depositions "in general" in support of various factual assertions and contains factual assertions without any citation to the record. Cf D.Kan. 56.1 ("Each fact in dispute ... shall refer with particularity to those portions of the record upon which the opposing party relies, ..."). In keeping with Rule 56.1, the facts in the statement of the defendant that have not been specifically controverted by plaintiff are deemed admitted for the purpose of summary judgment.

comments. Plaintiff testified that when Williamson made such comments she would change the subject back to idle chatter, away from herself.

10. According to plaintiff, Roger Williamson told her he liked her in glasses with no makeup, and she responded by saying "thank you."

11. Lori Desmarteau and Roger Williamson sometimes discussed their personal lives.

12. Lori Desmarteau and Roger Williamson were both having marital problems and began discussing them in May, 1995. Plaintiff was uncomfortable discussing her personal life with Mr. Williamson and would often change the subject to Mr. Williamson's personal life when he would make comments that made her feel uncomfortable.

13. Roger Williamson told Lori Desmarteau, probably early in May, 1995, that he was having problems at home with his wife; she was cold, unappreciative, and did not like to have sex.

14. Lori Desmarteau described to Roger Williamson her relationship with her estranged husband as "like World War III" and was concerned about being in a domestic violence situation.

15. Plaintiff discussed her sex life with Roger Williamson.

16. Plaintiff has heard and told dirty jokes of a sexual nature at work in the presence of Roger Williamson. Plaintiff is comfortable with these jokes in the workplace.

17. Lori Desmarteau and Roger Williamson both made sexual quips.

18. One night plaintiff came to work, and, because she had had marital problems at home, Roger Williamson told her to sit at Truesdell Junior High School, relax, get something to eat, and manufacture a daily activity report showing that she had worked. Plaintiff did this.

19. According to plaintiff, Roger Williamson told plaintiff she "owed him" for letting her sit at Truesdell, but he did not say what she owed him.

20. According to the plaintiff, after she had an accident in a police car, Roger Williamson asked her to meet him at a room at the Airport Hilton, while both were working. (He was a part-time employee of the hotel and she was on-duty at the time.) Once there, Roger Williamson gave plaintiff a form saying she was exonerated from all fault that but her penance was to "give him a blow job, clad in black garters and stockings." She tried to laugh it off and left.

21. According to Roger Williamson, he wrote a joke report about Desmarteau wrecking the car. Williamson showed Lori Desmarteau the real report and the joke report about the traffic accident at the same time, and they laughed about it.

22. According to plaintiff, sometime between May and September, 1995, Williamson asked to meet plaintiff at the Hilton. When she arrived, he rubbed her shoulders and tried to kiss her. When he tried to kiss her, she said, "I gotta go" and left.

23. Plaintiff never told Roger Williamson she did not want to be kissed.

24. Roger Williamson never tried to kiss plaintiff again.

25. Roger Williamson denies ever kissing Lori Desmarteau.

26. Plaintiff claims she was walking down the hallway at Patrol West when Roger Williamson took his radio antenna and rubbed it up her backside, between her legs.

27. After Roger Williamson ran the antenna up plaintiff's back, she turned and told him to quit.

28. According to plaintiff, Roger Williamson told plaintiff she looked good enough to eat, but plaintiff does not recall the circumstances of the comment.

29. According to Roger Williamson, before July 3, 1995, when plaintiff walked near Roger Williamson, she would say, "You smell good enough to eat."

30. According to Roger Williamson, one morning about 10:30 a.m., Lori Des-

marteau called Williamson at home and told him she was at Dillard's shopping for some new perfume. About 11:30–11:45 p.m., Lori Desmarteau went to Roger Williamson's office and asked to come in and close the door. She sat in the chair across from his desk and asked whether he was mad at her because he had not said anything about her new perfume. When Roger Williamson said he had not smelled it, Lori Desmarteau walked around the desk to him so he could smell it. When Roger Williamson told her it smelled nice, she asked him what she always said about his cologne, and he said the she always told him he smelled good enough to eat. Lori Desmarteau asked Roger Williamson whether she smelled that good, and he answered that she smelled good enough to eat. Plaintiff thanked him and left.

31. Lori Desmarteau and Roger Williamson were sitting in their respective police cars, side by side, when Lori Desmarteau put her hand over onto the sill of Roger Williamson's car, and he touched her hand.

32. Roger Williamson rubbed the back of plaintiff's hand; he did not hold her hand.

33. Plaintiff never told Roger Williamson to stop touching or trying to hold her hand.

34. According to plaintiff, Roger Williamson rubbed her shoulders and neck three to five times. Williamson says he did so at her request.

35. Plaintiff never told Roger Williamson not to rub her shoulders.

36. After July 3, 1995, when Lori Desmarteau learned Roger Williamson was separated from his wife, Lori Desmarteau called or paged Williamson four to six times daily.

37. Plaintiff complimented Williamson on his success with dieting.

38. Lori Desmarteau brought fruit to work for Roger Williamson.

39. Plaintiff talked with her husband about the situation with Roger Williamson about one week before she reported it to Chief Watson.

40. Plaintiff talked to Tom Burnett, the President of the Fraternal Order of Police, about the situation with Roger Williamson.

41. Prior to discussing the matter with Tom Burnett, Lori Desmarteau had not reported any sexual harassment to any person in the Wichita Police Department of Mr. Williamson's rank or higher.

42. Tom Burnett and Mike Desmarteau, plaintiff's husband, met with Chief Watson and told him Lori Desmarteau felt she had been sexually harassed by Roger Williamson. This was the first notice Chief Watson had of the matter.

43. Tom Burnett called plaintiff from Chief Watson's office and told her she needed to come to Chief Watson's office.

44. Chief Watson met with Lori Desmarteau after speaking with Tom Burnett and Mike Desmarteau on September 14, 1995. When plaintiff entered Chief Watson's office, the Chief assured her that sort of behavior would not be tolerated, that he would do everything within his power to get the situation resolved, and that she needed to go to Internal Affairs.

45. Chief Watson told plaintiff that if she had problems she could go to her supervisor, and, if she did not feel like she was being taken care of through her supervisors, she could come to him with any problems.

46. After talking to Chief Watson, on September 14, 1995, plaintiff went down the hall to Internal Affairs and spoke with Lt. Terry Nelson.

47. After talking with Tom Burnett, Chief Watson immediately directed Lt. Terry Nelson, the commander of Internal Affairs, to conduct an investigation of Lori Desmarteau's allegations.

48. Lt. Terry Nelson and Sgt. Cocking in Internal Affairs assured her she was doing the right thing by reporting this matter.

49. Roger Williamson was suspended by Chief Watson on September 14, 1995, pending the Internal Affairs investigation.

50. According to Lt. Terry Nelson, Lori Desmarteau told him it had been going on for three or four months, that she and Roger Williamson had been friends with marital problems, discussing things, and that Roger Williamson had been making sexual comments.

51. Lt. Terry Nelson received a handwritten document, written by Lori Desmarteau, describing several incidents and her concerns.

52. Roger Williamson admitted to Lt. Terry Nelson that he had rubbed Lori Desmarteau's shoulders and made physical contact, and that he and the plaintiff had discussed their personal lives and marriages.

53. Lt. Terry Nelson looked into whether there was any pattern of misbehavior by Roger Williamson toward female employees and did not find any.

54. Internal Affairs sustained four or five findings regarding Roger Williamson's failure of his duties as a supervisor and the likelihood of sexual harassment.

55. After concluding the investigation, Lt. Terry Nelson provided all information he had discovered to Chief Watson.

56. Roger Williamson was disciplined by Chief Watson as a result of Lori Desmarteau's allegations; he was demoted three ranks (from lieutenant to police officer) and given a pay cut.

57. A police officer is the lowest ranking law enforcement officer in the police department and ordinarily has no supervisory responsibility. One police officer can supervise another at the scene of an investigation until a superior officer arrives; the police officer with the lowest badge number is in charge.

58. Chief Watson transferred Roger Williamson to the northeast area of the City to work as a police officer so Lori Desmarteau, who was working Patrol West, would not have contact with him.

Chief Watson also specified that they work different shifts for the same reason.

59. After reporting the matter to Chief Watson, plaintiff continued to work at Patrol West, third shift.

60. Since Lori Desmarteau reported her concerns to Chief Watson, she has only seen Roger Williamson a couple of times in the City building and once while both were visiting a mutual friend in the hospital.

61. According to Roger Williamson, since the investigation, his only contact with Lori Desmarteau was when she entered the hospital room of the mutual friend he was visiting. He did not speak to her.

62. After the investigation, plaintiff told all of the people she worked with on third shift, Patrol West, about what had happened with Roger Williamson, and her co-workers seemed to be supportive and told her she had done the right thing.

63. Plaintiff believes that since she reported her sexual harassment concerns to Chief Watson, certain officers and supervisors have driven by and parked near her house, looking for some sort of violation. No one has told plaintiff that this belief is well-founded.

64. Major Hershberger sent an e-mail to Lori Desmarteau's supervisor requesting the supervisor ask her not to park on the grassy area in front of her residence. This was prompted by an anonymous neighborhood complaint.

65. Plaintiff received several parking tickets at her home, and each was properly given.

Although plaintiff has a belief that certain supervisors, including Major Hershberger, were watching her, she never saw any of those supervisors near her home.

66. Plaintiff is uncertain whether she informed Chief Watson of her belief supervisors were watching or driving by her house.

67. In her journal, plaintiff recorded her belief that Major Hershberger and

Lieutenant Delamaide would like to see her dead or disabled, although neither of these supervisors said or did anything directly that would lead her to believe they intended to do her bodily harm.

68. Plaintiff claims that retaliation by the City for reporting sexual harassment includes its investigation of a complaint by her neighbors (neither of whom are on the Wichita Police Department) of sexual assault. Specifically, she objects to the fact she was suspended on a Friday without being told what the investigation was about and having to wait until Monday to find out what the investigation was about.

69. Plaintiff was suspended for several days with full pay while the complaint from her neighbors was investigated.

70. Plaintiff does not know whether or not her suspension was done in a manner consistent with how other officers have been suspended pending an investigation.

71. Plaintiff heard through co-workers that the letter suspending her during the investigation had been basically copied from a letter given to another officer when he had been suspended.

72. Plaintiff was not disciplined or charged criminally as a result of the complaint by her neighbors.

73. Plaintiff's claim of retaliation includes being penalized for using all of her sick and vacation leave. Plaintiff talked to Chief Watson about the supervisors at Patrol West; she told him she believed they were picking on her about her sick leave.

74. Regulations prohibit going into without pay (WOP) status by using more sick leave than is accrued. Plaintiff went into WOP status and was not paid while off work.

75. Plaintiff had been warned about her use of sick leave prior to reporting her sexual harassment claim. In her May, 1995, evaluation, made prior to her report of sexual harassment, plaintiff was criticized for her absenteeism, and the evaluation noted that plaintiff had been warned about her use of sick leave.

76. Plaintiff's excessive use of sick leave has been noted in every evaluation plaintiff received from the City.

77. Supervisors spoke to Chief Watson about plaintiff's sick leave use both before and after her sexual harassment complaint.

78. On March 12, 1997, plaintiff received a written reprimand for abuse of sick leave.

79. Plaintiff received reprimands in 1995 and 1996 for failing to qualify with her firearm; these reprimands were appropriate.

80. When Chief Watson asked Lori Desmarteau for examples of the retaliation she claimed, she only remembers telling him about her being picked on about her use of sick leave. She doesn't believe she told him her belief that supervisors were keeping her home under surveillance, although she is not sure.

81. On March 5, 1996, plaintiff was investigated for failing to follow a direct order from a supervisor and failing to make a report. Plaintiff was suspended as a result.

82. On November 6, 1995, plaintiff received a reprimand for failure to devote full time and attention to official police duty and for violating the lunch policy by spending 45 minutes at her home for lunch, which exceeds the 30-minute limit. According to plaintiff, the enforcement of this time limit is a rarity; officers routinely spent more than thirty minutes for lunch and were not disciplined for it.

83. Based on advice from her attorney at the time, Lori Desmarteau did not file any grievance regarding any discipline imposed after September, 1995.

84. Plaintiff was on light duty after being kicked in the knee, while on the job, from the date of the injury until she retired on April 23, 1998.

85. Plaintiff asked the Chief of Police to assign her to the day shift in Records and he did.

86. While on light duty, plaintiff was assigned to Badge on the Floor and Records. This is where light duty officers are generally assigned. Plaintiff contends that she was told at one point that, instead of reading magazines or other casual material, she was to read policy and procedure manuals and statutes.

87. In October, 1995, and again in October, 1997, plaintiff told the Chief of Police that she could not be a police officer.

88. Plaintiff received evaluations for 1996 and 1997.

89. Plaintiff filed this action on September 29, 1997.

90. Roger Williamson held the rank of lieutenant until December 16, 1995.

91. Roger Williamson was a lieutenant in Patrol West, but in a different sector from the sector Lori Desmarteau was in.

92. When Roger Williamson was an acting captain at Patrol West, all employees on his shift would have been his subordinates.

93. Prior to his death, Dr. Ronald L. Martin, M.D., evaluated plaintiff and diagnosed her as suffering from "adjustment disorder with anxiety and depressive symptoms" and found that she was disabled. Dr. Martin also stated that "the cause or at least precipitant of her disability was the sexual harassment which the claimant endured between May and approximately September 1995." In addition, plaintiff was evaluated by Gary R. Hackney, Ph.D., who found that plaintiff was suffering from a "moderate to severe mental disorder," and that she exhibited symptoms of Post–Traumatic Stress Disorder. He further stated that "[h]er stressor was the sexual harassment and the resultant behavior of the police department."

Plaintiff believes she was given "the snitch treatment" as a result of her reporting the conduct of Roger Williamson.

## II. Summary Judgment Standard.

A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule suggests by its plain language that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The determination of which facts are material depends on the substantive law of the case (i.e., the elements of the claim asserted). *See Id.* at 248, 106 S.Ct. 2505. A genuine issue of material fact exists when a jury of reasonable people could find for the party opposing the motion. *See Id.*

When evaluating the record, the court views the evidence in the light most favorable to the nonmoving party. The moving party bears the initial burden of showing that there is an absence of any issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the nonmoving party may not rest upon his pleadings, but must come forward with specific facts showing there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere conclusory statements are inadequate to defeat a summary judgment motion. See *Nichols v. Hurley,* 921 F.2d 1101, 1113 (10th Cir. 1990).

## III. Discussion.

### A. Plaintiff's Claim Under Title VII of Civil Rights Act of 1964.

Plaintiff's claim under Title VII includes two main arguments: (1) that her treatment at the hands of Roger Williamson constituted quid pro quo and hostile work environment sexual harassment, for which

the City is directly and vicariously liable; and (2) that the City is liable because its employees or agents retaliated against plaintiff after she filed complaints of sexual harassment with the EEOC and the Kansas Human Rights Commission.

In its motion for summary judgment on the Title VII claim, the City makes the following arguments: (1) that plaintiff did not suffer any tangible employment action by Williamson; (2) that plaintiff has failed to cite evidence sufficient to establish sex discrimination under a "hostile work environment" theory; (3) that even if Williamson's actions constituted sex discrimination, the City is entitled to judgment as a matter of law under the affirmative defense recognized in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); (4) that plaintiff fails to cite evidence sufficient to support a claim of retaliation; and (5) that plaintiff's claim for punitive damages is barred by 42 U.S.C. § 1981a(b)(1) and by plaintiff's failure to respond to a request for admission on that issue.

(1). *Williamson's Alleged Sexual Harassment.*

■■■ The court will first address plaintiff's claim as it relates to alleged sexual harassment by Roger Williamson. In determining the City's liability, if any, for this conduct, the court must first determine whether Williamson's conduct could be found to constitute sex discrimination within the meaning of 42 U.S.C. § 2000e–2(a). Title VII may be violated where a supervisor creates an abusive working environment because of an employee's gender. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). For such a "hostile environment" claim to survive a summary judgment motion, " 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Penry v. Federal Home Loan Bank of Topeka*, 155

F.3d 1257, 1264 (10th Cir.1998). In order to determine whether conduct was sufficiently severe or pervasive enough to be actionable sexual harassment, a court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cadena v. The Pacesetter Corp.*, 18 F.Supp.2d 1220, 1226 (D.Kan.1998) (citing *Faragher*, 524 U.S. at ——, 118 S.Ct. at 2283) (internal quotations omitted). In considering these factors, a court also must consider the context in which the conduct occurred. *Id.* Under the foregoing standard, the court rejects the City's argument that Williamson's conduct, as a matter of law, could not constitute sexual harassment. In particular, the court notes plaintiff's evidence that on several occasions Williamson engaged in offensive touching of the plaintiff. For example, she testified that on one occasion he took his radio antenna and rubbed it up her backside, between her legs. On other occasions he rubbed her shoulders and once rubbed her shoulders and tried to kiss her. On another occasion he suggested that she engage in a sexual act as "penance" for his help and at other times told the plaintiff that she "owed him" under circumstances that could be taken to be sexually suggestive. Several of these incidents involved not only objectively offensive conduct but also an element of humiliation directed at plaintiff. According to plaintiff's evidence, Williamson's conduct occurred over a period from May to September, 1995. The City argues that Williamson believed plaintiff encouraged some of his behavior and comments, that his conduct was a product of the joking nature of their relationship, and that in a context where both individuals were discussing intimate details of their lives his actions did not create a hostile environment. But while such arguments might be persuasive to a jury, they do not entitle the City to judgment as a matter of law.

A reasonable jury could find from the evidence cited that Williamson's conduct was sufficiently severe and pervasive to constitute sex discrimination.[2]

Because a jury could find Williamson's conduct constituted sex discrimination, the next issue is whether the City can be held liable for his conduct. In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court attempted to clarify the scope of an employer's liability under Title VII for sexual harassment by one of its employees. In doing so, the Court applied traditional principles of agency law, including Section 219 of the Restatement (Second) of Agency.

▮] The first principle discussed in *Burlington* was § 219(1) of the Restatement, under which a master is subject to liability for the torts of his servants committed while acting in the scope of their employment. *Id.*, 118 S.Ct. at 2266. To fall within the scope of employment, the agent's conduct must be actuated, at least in part, by a purpose to serve the employer. *Id.* In the instant case, plaintiff cites no evidence to reasonably suggest Williamson's alleged harassment was motivated by a desire to serve the City of Wichita. As such, § 219(1) provides no basis for liability.

▮ The second principle discussed in *Burlington* dealt with § 219(2) of the Restatement, which provides that an employer is not liable for torts of his employee acting outside the scope of employment unless:

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or speak on behalf of the principle and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Burlington*, 118 S.Ct. at 2267. Plaintiff does not argue that the City intended for Williamson's conduct to occur or that the conduct involved a non-delegable duty. Thus, the court is concerned only with subsections (b) and (d) above. Under subsection (b), an employer will be liable where its own negligence was the cause of the harassment. *Burlington*, 118 S.Ct. at 2267. An employer is negligent if it knew or should have known about the sexual harassment and failed to stop it. *Id.* Although plaintiff's complaint alleges such a claim, plaintiff does not specifically argue the point in her brief, nor does she cite any evidence that could support such a finding. The undisputed facts show that the City acted promptly to end Williamson's alleged harassment as soon as she reported it. There is no evidence to suggest the City should have known of the harassment prior to that time. Thus, there is no basis for liability under subsection (c).

As applied in a sexual harassment case, subsection (d) concerns vicarious liability when the employee used apparent authority to commit the harassment or when the employee was aided in accomplishing the harassment by the existence of the agency relation. Because a supervisor who harasses a subordinate is almost always aided by the agency relation, the Supreme Court decreed in *Burlington* that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.*, 118 S.Ct. at 2270. The undisputed facts show that Williamson had supervisory authority

---

**2.** Plaintiff's Response contains extensive discussion of the distinction between quid pro quo and hostile work environment harassment. In view of the court's finding above that plaintiff has sufficient evidence to support a discrimination claim based on a hostile working environment, any further discussion of the distinction between these two concepts is immaterial. *See Burlington*, 118 S.Ct. at 2264.

over the plaintiff; thus, the City is vicariously liable for Williamson's harassment unless the City establishes it is entitled to the affirmative defense recognized in *Burlington.*

### (2). *Employer's Affirmative Defense.*

 When a harassing supervisor takes a "tangible employment action" against the plaintiff, the actions of the supervisor are always attributable to the employer, and the employer is liable. *Burlington,* 118 S.Ct. at 2268. But when the harassing supervisor takes no tangible employment action, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *Id.* The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

 As noted above, an employer is precluded from asserting the affirmative defense if the supervisor took a tangible employment action against the plaintiff. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington,* 118 S.Ct. at 2268. Plaintiff argues she "did suffer tangible adverse employment actions" in that she "suffered a job loss." Pl.Resp. At 14–15. "Such job loss was a tangible job consequence suffered by plaintiff as a result of sexual harassment inflicted by her supervisor...." *Id.* at 15.[3] Specifically, plaintiff alleges that Williamson's harassment caused her severe emotional distress, which led to her disability retirement.[4] The court concludes that such an allegation does not involve a "tangible employment action" by Williamson within the meaning of *Burlington* and *Faragher.* The definition, rationale and application of the term in *Burlington* uniformly suggest that it refers only to employment actions directed by the supervisor. As explained in *Burlington:*

> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must ob-

---

**3.** Plaintiff also asserts she was denied merit raises and family leave. Pl.Resp. at 15. Although these are tangible employment actions, they were taken by supervisors other than Roger Williamson, and plaintiff cites no evidence that the actions were taken on account of her sex. Insofar as plaintiff contends such actions were taken in retaliation for her complaint against Williamson, the court concludes plaintiff has failed to show any causal connection between the adverse actions and her prior complaint against Williamson.

Plaintiff also mentions the fact that Williamson absolved her of fault for wrecking a police car. Pl.Resp. at 15. The concept of tangible employment actions in *Burlington,* however, does not include actions that benefit the plaintiff; it refers only to adverse job actions. *See e.g. Id.* 118 S.Ct. at 2269 (referring to actions taken against the subordinate that cause economic injury).

**4.** Although not phrased as such, this appears to be an argument that plaintiff was constructively discharged, and that a constructive discharge constitutes a tangible employment action. The courts are already divided over whether a constructive discharge is a "tangible employment action" as defined in *Burlington* and *Faragher. See e.g., Equal Employment Opportunity Comm. v. Barton Protective Services, Inc.,* 47 F.Supp.2d 57 (D.D.C.1999) (plaintiff's claim of constructive discharge would not amount to a tangible employment action even if proven); *Lintz v. American Gen. Finance, Inc.,* 50 F.Supp.2d 1074 (D.Kan. 1999) (the parties agreed that constructive discharge constitutes tangible employment action); *Powell v. Morris,* 37 F.Supp.2d 1011, 1019 (S.D.Ohio 1999) (constructive discharge is not a tangible employment action); *Galloway v. Matagorda County, Texas,* 35 F.Supp.2d 952, 956 (S.D.Tex.1999) (constructive discharge is tangible employment action).

tain the imprimatur of the enterprise and use its internal processes.

*Id.* at 2269. For these reasons, the Court explained, "a tangible employment action *taken by the supervisor* becomes for Title VII purposes the act of the employer." *Id.* (emphasis added). This focus on the tangible actions of the supervisor would logically exclude actions which are only "constructively" attributed to him, and would exclude employment consequences arising from a plaintiff's particular reaction to a hostile working environment. Any doubt in this regard is dispelled by the *Burlington* case, in which the plaintiff alleged that she had been constructively discharged. *See Burlington*, 118 S.Ct. at 2263. Despite this allegation, the Court did not include constructive discharge in its definition of tangible employment action. More significantly, the Court stated that the plaintiff had not alleged a tangible employment action and concluded the defendant should have an opportunity to assert the affirmative defense upon remand. *Id.* at 2271. This view of what constitutes a tangible employment action is incompatible with plaintiff's argument. Because Williamson, the allegedly harassing supervisor, took no tangible employment action against plaintiff, the City is not precluded from asserting *Burlington's* affirmative defense.

▮ A defendant satisfies the first element of the affirmative defense by showing that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *Burlington*, 118 S.Ct. at 2270. The undisputed facts in this case show that the City met its duty. The City had in place and promulgated a policy against sex discrimination before any of the events at issue in this case. Its employees, including the plaintiff, were given training concerning the policy. The City's procedures permitted complaints to be made without going through the harassing supervisor. There is no evidence that the City failed to enforce the policy or otherwise failed to act after receiving complaints of discrimination. With respect to plaintiff's specific complaint against Roger

Williamson, the evidence is likewise uncontroverted. Once plaintiff initiated her complaint in September of 1995, the Chief of Police personally assured her such behavior would not be tolerated and initiated an investigation of Williamson. Williamson was suspended pending the investigation. After Internal Affairs returned four or five findings regarding the likely merits of plaintiff's claim, Watson demoted Williamson three ranks (from lieutenant to police officer, the lowest rank) and gave him a pay cut. Watson then reassigned Williamson to a different part of the city and to a different shift to decrease the likelihood that Williamson and plaintiff would interact while on duty. The fact that plaintiff had the support of the Chief of Police, the local president of the Fraternal Order of Police, the investigating officers from Internal Affairs, and her coworkers at Patrol West suggests the defendant did almost everything possible to create a responsive atmosphere to claims such as plaintiff's. *Cf. Faragher*, 118 S.Ct. at 2293 (plaintiff and her colleagues were " 'completely isolated from the City's higher management'.").

▮ Plaintiff suggests the City's unwillingness to fire Williamson shows the City failed to adequately address the problem. However, plaintiff offers no legal support for this position. An employer need not necessarily terminate a supervisor to comply with Title VII. *See McCoy v. Macon Water Authority*, 966 F.Supp. 1209, 1219 (M.D.Ga.1997). The City's response was adequate to correct the problem, as is evidenced by the fact that Williamson's harassment terminated immediately upon plaintiff's complaint to Chief Watson in September of 1995. Plaintiff cites no evidence in the record to suggest the City failed to meet its duty.

▮ The second element of the affirmative defense—that the plaintiff unreasonably failed to avail herself of the preventive or corrective opportunities provided by the employer or to avoid harm otherwise—is also satisfied in this

case. According to *Burlington,* 118 S.Ct. at 2270,

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

The defendant argues that plaintiff's delay in filing a complaint against Williamson was unreasonable, and the City should not be liable for her unwillingness to bring the matter to the proper authorities. The plaintiff's inability to provide a clear timeline of events makes it somewhat difficult to determine just how much time passed between the more egregious events and her eventual complaint to Chief Watson, but it appears undisputed that it was approximately five months from the first instance of improper behavior until she made her complaint (from May to September, 1995). Plaintiff argues that the delay in her decision to report Williamson's behavior was due to concern he might retaliate against her.[5] Such a justification lacks any objectively reasonable basis in the record. Plaintiff knew about the City's sexual harassment policy and was aware the City had Equal Employment Officers. The City's procedure would have allowed plaintiff to by-pass Roger Williamson in making a complaint. There is no evidence that the City's policy was inadequate or went unenforced. Despite this knowledge and the network of support available to her, plaintiff chose not to file a complaint about Williamson's harassing behavior until some five months after it began and until after she had already suffered severe emotional distress. While such a delay might not be material in other circumstances, it is significant here because plaintiff claims the

distress from the ongoing harassment during this time became so severe it led to her disability retirement. Given the availability of a mechanism for dealing with improper conduct by a supervisor, there can be no question that assertion of a complaint in a timely manner would have prevented the hostile working environment and the consequent harm claimed by plaintiff. *See Burlington,* 118 S.Ct. at 2270 ("To the extent limiting employer liability could encourage employees to report harassing conduct before it becomes severe or pervasive, it would ... serve Title VII's deterrent purposes."). As noted in *Faragher,* "a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute." *Id.,* 118 S.Ct. at 2292. Indeed, the primary objective of Title VII is not to provide redress but to avoid harm. *Id.* Because of this, "[i]f the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care...." *Id.* The court concludes that plaintiff's delay in this case constituted an objectively unreasonable failure on her part to take advantage of the opportunities for prevention and correction provided by defendant's policy against sexual harassment. *See Dedner v. Oklahoma,* 42 F.Supp.2d 1254, 1260 (E.D.Okla.1999) (unjustified delay in reporting harassment was unreasonable for the purposes of affirmative defense); *EEOC v. Barton Protective Services, Inc.,* 1999 WL 342402, *3 (D.D.C., May 25, 1999); *Mirakhorli v. DFW Mgmt. Co.,* 1999 WL 354226, *7 n. 16 (N.D.Tex., May 24, 1999). Under the circumstances, the City is entitled to judgment as a matter of law insofar as plaintiff claims the City is liable for Roger Williamson's conduct.

---

**5.** In support of this concern, plaintiff alleges that Williamson had bragged about his special talent for affecting the careers of other police officers. This assertion is unavailing for two reasons. First, the deposition pages cited to support this allegation are not contained in the record. Second, given the fact that the City's complaint procedure would have permitted plaintiff to by-pass Williamson, she makes no showing that her fear about Williamson's ability to affect her job was reasonable.

**(3). *Retaliation Claim under Title VII.***

Plaintiff also contends that agents and employees of the City retaliated against her for filing a complaint against Williamson. *See* 42 U.S.C. § 2000e–3(a). To sustain a retaliation claim under Title VII, plaintiff must show: (1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding, (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation, and (3) there is a causal connection between the protected activity and the adverse employment action. *See Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1263–64 (10th Cir.1998).

In her response to the motion for summary judgment, plaintiff identifies ten specific incidents as support for her claim of retaliation. Yet, whether considered separately or as a whole, these allegations fail to create a genuine issue of material fact. Specifically, plaintiff fails to cite competent evidence to support either the second or third elements of a prima facie retaliation claim. For the most part, plaintiff provides only her subjective belief as evidence of a causal connection between her complaint and these incidents. For the purpose of clarity, the court will address each of these complaints individually.

 First, plaintiff alleges she that she received poor work evaluations after filing her sexual harassment complaint. Plaintiff admits, however, that the reprimands she received due to failure to qualify with a firearm were properly given. Moreover, her abuse of sick leave had been noted on her evaluations both before and after her sexual harassment claim, and such reprimands therefore do not create an inference of a causal connection with her complaint. In sum, plaintiff fails to show that these reprimands, or any other negative comments on her evaluations, are causally connected to her protected activity. Plaintiff's second allegation—that the reprimands she received on the job were "scrutinizing and petty"—fails for the same reasons.

 Third, plaintiff alleges that requirements made of her after her transfer to "Badge on the Floor" were retaliatory. Plaintiff alleges that while on light duty she was required to read Kansas Statutes instead of the casual reading that officers on light duty were usually allowed to read. Even assuming this episode was causally related to plaintiff's complaint (although plaintiff cites no evidence of who made such a directive or why), the court nevertheless concludes it will not support a claim. Plaintiff requested the reassignment to light duty and the mere inconvenience of reading statute books instead of magazines is not an adverse employment action. *Cf. Sanchez v. Denver Public Schools,* 164 F.3d 527, 533 (10th Cir.1998) (no adverse employment action where there was no significant effect on employment status).

 Fourth, plaintiff believes her suspension with pay pending the investigation of an unrelated sexual assault complaint by her neighbor is evidence of retaliation. However, plaintiff provides no evidence that her treatment during the investigation was different from the treatment received by other officers facing investigation. In fact, plaintiff admits her understanding that the letter notifying her of the suspension was copied from a letter previously used to suspend a male officer. As such, no evidence has been cited to satisfy the causal connection element.

 Fifth, plaintiff alleges that supervisors within the Wichita Police Department have been keeping her home under surveillance. Plaintiff has never seen any supervisors engaging in such conduct, however, and cites no evidence that any supervisor knew of or condoned such conduct. Plaintiff's supervisor did receive an e-mail message from Major Hershberger requesting the supervisor to ask her not to park her car on the grassy area in front of her residence. This message was supposedly prompted by an anonymous neighborhood complaint. Plaintiff also subsequently received several parking citations at her

home, and plaintiff admits that the citations were properly given. Even if plaintiff could show a causal connection relating to these actions, they do not constitute adverse employment actions and therefore cannot support a claim under Title VII. *See Sanchez,* 164 F.3d at 533 (plaintiff must show conduct that affected her employment status).

▉▉ Sixth, plaintiff alleges that the City's denial of merit raises constituted an act of retaliation. The uncontroverted facts are that plaintiff was a police officer who had failed to qualify with a firearm in two consecutive years, who had violated the Department's sick leave policy, and who had received other properly given reprimands. In order to sustain a retaliation claim, plaintiff would have to provide some evidence that an officer in her situation would likely receive a merit raise. Plaintiff cites no such evidence, nor does she cite anything to suggest that the supervisors responsible for these decisions retaliated against her. The mere fact that the denial of merit increases occurred after her complaint was made is not sufficient by itself to support a claim. Plaintiff must cite some evidentiary basis other than her personal belief to show a causal connection between these events.

Seventh, plaintiff alleges there was a delay in the approval of her disability retirement. As an initial matter, plaintiff cites no evidence that the amount of time it took to obtain approval of her application was out of the ordinary. Moreover, she fails to cite evidence that the handling of the application by the Police and Fire Retirement Board—a sixteen-member board—was in any way connected to her complaint of sexual harassment.

▉▉▉ Eighth, plaintiff alleges that the City's denial of Family Medical Leave Act (FMLA) time forced her to go into "without pay status." Again, plaintiff presents no evidence to show that her FMLA claim should have been approved, that those in charge of the claim were influenced by her complaint, or that there was any other causal connection between her harassment complaint and the denial of her FMLA relief.

Plaintiff's ninth allegation—that she received "disparate treatment with respect to assigned duties and enforcement of department policy"—is untenable due to lack of specificity and no reference to evidence in the record. Generally, this allegation fails to identify evidence in support of the second and third elements of a retaliation claim.

Finally, plaintiff's tenth allegation is that she observed a memo sent by Major Hershberger to other superior officers stating that plaintiff should be "slam dunked" out of the Department. The court cannot properly assess this contention because the pages of Ms. Desmarteau's deposition referred to in support of it are not in the record. In addition, plaintiff offers no evidence to put Major Hershberger's comment into a context that would causally connect it to her sexual harassment claim. In light of the uncontroverted evidence that plaintiff received various reprimands and informed Chief Watson she was not sure of her abilities as a police officer, an inference of retaliation cannot be assumed from the mere fact that Major Hershberger may have made such a statement. Also, plaintiff would have to show not only that Major Hershberger intended to retaliate, but that also he caused some adverse employment action to be taken against plaintiff. No such evidence is cited.

In sum, the court finds plaintiff has failed to cite evidence showing a genuine issue of fact for trial on the elements of a claim for retaliation under Title VII. This failure likewise precludes plaintiff's claim for punitive damages. Accordingly, the City is entitled to judgment as a matter of law on the retaliation claim.

## B. State Law Claims (Counts Two Through Five).

Plaintiff's complaint also asserts claims under Kansas law for assault, battery, intentional infliction of emotional distress,

and negligent retention of an employee.[6] In its motion for summary judgment, the City argues these claims are barred by the applicable statutes of limitation. For purposes of this motion, it is undisputed that all of Williamson's acts giving rise to these claims occurred prior to September 15, 1995, and that the present action was filed on September 29, 1997.

 Plaintiff concedes the assault and battery claims, which are subject to a one-year limitations period under K.S.A. 60–514(b), were filed more than one year after the underlying events occurred, but argues the statute of limitations was tolled until the EEOC issued a right-to-sue letter. The court must reject this contention. The only case cited by plaintiff dealing with Kansas law actually contradicts plaintiff's position. In *Edwards v. Boeing*, No.92-3276, 1993 WL 214566 (10th Cir., June 18, 1993), the Tenth Circuit found that a claim by a plaintiff under the Kansas Act Against Discrimination did not accrue until the EEOC issued a right-to-sue letter because the KAAD contains an administrative exhaustion requirement. *Id.* at *2. By contrast, a tort claim by the same plaintiff for wrongful discharge accrued at the time of the unlawful act because that claim was not subject to an exhaustion requirement. *Id.* Under the reasoning of *Edwards*, plaintiff's claims of assault and battery were not tolled by the filing of an administrative complaint because these claims were not subject to an exhaustion requirement. As such, the claims are now barred by the statute of limitations. For the same reasons, plaintiff's claim of intentional infliction of emotional distress, which is subject to a two-year limitations period under K.S.A. § 60–513(a)(4), is also time-barred. The court rejects plaintiff's contention that "the earliest plaintiff could have been aware of her injury was June 9, 1997" when plaintiff first contacted her physician. Notwithstanding the fact that plaintiff did not obtain a medical evaluation until 1997, plaintiff was clearly aware in 1995, as any reasonable person would be, that the alleged harassment was causing her severe emotional distress at the time it occurred. *See P.W.P. v. L.S.*, 266 Kan. 417, 969 P.2d 896, 902 (1998) (objective knowledge of injury triggers statute of limitations). Plaintiff's claim accrued, if at all, prior to September 15, 1995, when Williamson's alleged harassment ended, and is now barred by the statute of limitations.

Finally, with respect to plaintiff's claim for negligent retention of Roger Williamson, the City seeks summary judgment by pointing out that this court has declined to recognize such a claim when the injured party is a co-employee, as opposed to a third-party. *See e.g., Beam v. Concord Hospitality, Inc.*, 920 F.Supp. 1165, 1168 (D.Kan.1996). Plaintiff's response does not address this argument, and the court concludes the issue is uncontested.

In sum, the court concludes the City is entitled to judgment as a matter of law on all of plaintiff's state law claims as well as the Title VII claims.

### IV. Conclusion.

The defendant City of Wichita's motion for summary judgment (Doc. 48) is hereby GRANTED. The clerk is directed to enter a judgment of dismissal in favor of the defendant.

IT IS SO ORDERED.

---

**6.** These claims are set forth in the complaint but do not appear in the Pretrial Order.