Nancy CHERRY, Plaintiff,

v.

MENARD, INC., Defendant.

No. C99–4029.

United States District Court,
N.D. Iowa,
Western Division.

June 15, 2000.

---

David L. Reinschmidt, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

John Werner, Grefe & Sidney, Des Moines, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ............................................................... 1164
 A. *Procedural Background* .............................................. 1164
 B. *Factual Background* ................................................. 1164
II. *STANDARDS FOR SUMMARY JUDGMENT* .............................. 1166
III. *LEGAL ANALYSIS* ........................................................ 1168
 A. *Cherry's Sexual Harassment Claim—hostile work environment* ............ 1168
 1. *Cherry's showing of the effect on her employment* ..................... 1169
 2. *Employer liability for supervisory sexual harassment* ................. 1170
 a. *The Ellerth/Faragher affirmative defense* ......................... 1170
 b. *Constructive discharge is a tangible employment action as defined in Ellerth and Faragher* ...................................... 1171
 c. *Application of the Ellerth/Faragher affirmative defense* ............ 1177
 3. *Employer liability for non-supervisory co-worker sexual harassment* .. 1178
 B. *Cherry's Racial Harassment claim-hostile work environment* .............. 1180
 1. *Cherry's showing of the effect on her employment* ..................... 1180
 2. *Employer liability for supervisory racial harassment* ................. 1182
 3. *Employer liability for non-supervisory co-worker racial harassment* .... 1183
 C. *The Retaliation Claims* .............................................. 1184
 1. *Cherry's evidence of "adverse action"* ............................... 1185
 2. *Cherry's evidence of causal connection* .............................. 1187
 D. *Constructive Discharge* ............................................. 1187
 1. *Proof of constructive discharge* ..................................... 1187
 2. *Cherry's evidence of constructive discharge* ......................... 1188
IV. *CONCLUSION* ............................................................ 1189

In this employment discrimination lawsuit, the plaintiff-employee alleges that her former employer violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by subjecting her to a hostile work environment and then retaliating against her for engaging in protected activity to remedy the alleged harassment. The plaintiff-employee further alleges that the hostile work environment and the retaliation caused her constructive discharge. The employer has moved for summary judgment on all counts. Because plaintiff's allegations of sexual and racial harassment are directed against not only her non-supervisory co-workers, but also against her supervisors, the court must consider the affirmative defense set forth by the United States Supreme Court in *Burlington Indus., Inc. v. Ellerth*, ·524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Additionally, the court is called upon to resolve a critically important question triggered by the *Ellerth/Faragher* affirmative defense analysis: Whether a constructive discharge constitutes a "tangible employment action" as defined in *Ellerth* and *Faragher*?

## I: INTRODUCTION

### A. Procedural Background

On April 21, 1999, plaintiff Nancy Cherry ("Cherry") filed a complaint against her former employer, defendant Menard, Inc. ("Menards"), seeking damages resulting from her alleged constructive discharge. In her complaint, Cherry alleges three causes of action: (1) a claim of a sexually hostile work environment; (2) a claim of a racially hostile work environment; and (3) a claim of retaliation. Menards answered

the complaint on June 24, 1999, generally denying Cherry's claims and asserting various defenses, including the two prong affirmative defense outlined in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).[1] Presently before the court, is Menards's March 27, 2000, Motion for Summary Judgment.

On May 23, 2000, the court heard oral arguments on Menards's Motion for Summary Judgment. Menards was represented by John Werner of Grefe & Sidney, Des Moines, Iowa. Cherry was represented by David L. Reinschmidt of Munger, Reinschmidt & Denne, Sioux City, Iowa. The court will begin with the factual background established by the summary judgment record. Next, the court will set forth the standards applicable to a motion for summary judgment. Finally, the court will turn to its legal analysis of Menards's motion.

### B. Factual Background

Nancy Cherry is a thirty-three year old African–American female. Cherry was an employee for Menards from approximately July 17, 1997 until June 22, 1998. When Cherry commenced her employment with Menards in 1997, the store manager was Glen Brunick. In November of 1997, however, Brad Kwallek replaced Glen Brunick and became the new store manager and remained such throughout Cherry's employment with Menards. Initially, on or about July 17, 1997, Cherry was hired on a part-time basis at the Menards store in Sioux City, Iowa, as a sales associate in the electrical department. Cherry's managers in the electrical department were Glenn Clark and Janelle Knight. Thereaf-

---

1. The court points out that although Menards managed to assert eleven affirmative defenses, it failed to include the most significant language of the *Ellerth/Faragher* affirmative defense. For example, Menards did not include language asserting that it exercised reasonable care to prevent the alleged behavior, or that Cherry unreasonably failed to take advantage of any corrective opportunities Menards provided. However, because Cherry did not argue that Menards's answer did not adequately assert the *Ellerth/Faragher* affirmative defense, the court will construe Menards's answer as asserting this affirmative defense.

ter, on or about November 23, 1997, Cherry switched to the plumbing department where she began to work on a full-time basis. Cherry's supervisors in the plumbing department were John Kerns and Clark Ulven.

Cherry's claim of a sexually hostile work environment is based on allegations of harassment by both supervisors and non-supervisory co-employees. Cherry claims that in January of 1998, Clark Ulven, her supervisor in the plumbing department, grabbed his penis and uttered extremely crude remarks to Cherry, emphasizing that he had black women before, and further explaining what he did with these women sexually. Cherry claims that Ulven crudely talked about a girl named Stacey (another employee at Menards) to her, explaining how he wanted to take advantage of her, and that she was a whore because she allowed all the guys in the yard to be with her. On or about April 10, 1998, Cherry claims that her co-worker, James Jepsen, told her she had a nice ass. Thereafter, on April 13, 1998, Cherry claims that Jepsen told her, "I would like to fuck you." On April 16, 1998, Cherry claims that Jepsen grabbed her butt. Cherry also claims that Jepsen told her that he dreamed of having sex with her. Cherry claims that in late May, 1998, Jepsen grabbed Cherry around the waist and kissed her on the lips. Cherry claims that Jepsen and Ulven routinely used vulgar, sexual language and talked about sex in the presence of female employees. Lastly, Cherry claims that Gene Smith refused to help her with the customers, and walked away, grabbing his penis saying he was going to the bathroom.

Regarding all of her complaints of sexual harassment, Cherry claims that after reporting these complaints to Menards, it did not respond. Thus, Cherry claims that Menards took no remedial measures to stop Ulven's, Smith's, and Jepsen's sexually hostile behavior or to correct the sexually hostile work environment that was pervasive throughout Menards. Because no remedial measures were taken, and because the sexually hostile environment at Menards was pervasive and destructive, Cherry alleges that she was constructively discharged. In contrast, Menards asserts that Cherry failed to report several of the allegations listed above, and therefore, Menards was unaware of the sexually hostile work environment. As for the allegations that Cherry did report specific incidents of hostile behavior to Menards, Menards claims that it took prompt and remedial action to cure such conduct, which included investigating Cherry's complaints as well as reprimanding those individuals who Cherry alleged sexually harassed her.

Cherry's claim of a racially hostile work environment is likewise based on the actions of both her supervisors and non-supervisory co-workers. In September of 1997, Cherry claims that she was introduced to the racially hostile environment through several months of constant degrading comments about minorities made by her supervisor, Glenn Clark. Cherry claims that although many of the comments and actions taken by Clark were directed at other races, including Asians and Hispanics, Cherry was offended because she claims that Clark's behavior was directed toward minorities in general, African–Americans included. For example, Cherry claims that Clark referred to Mexicans as "spics," and Asians as "gooks." Cherry further claims that Clark stated "they need to get back on the boat and sail away, they need to go back to the border, I hate those Mexicans." Cherry also observed that when Mexicans would come up to Clark and ask him a question, "he'd just look at them and walk right away from them." In October of 1997, Cherry claims one of her co-workers, William Engelman, referred to a white customer who had a black child as a "nigger-digger." On or about October 25, 1997, Cherry claims that she saw a grill display in the electrical department with big red letters "KKK." Cherry told Dan Browning, who was the assistant plumbing manager, about this incident to which he allegedly replied "What in the hell do you want me to do about it?" In December of 1997, Cherry claims that

her co-workers teased her about the derogatory term "sambo." On or about January 25, 1998, Cherry claims that she picked up an internal telephone and heard the voices of, *inter alia,* Glenn Clark, Clark Ulven, and Chris Mitchell, all of whom held supervisory positions at Menards, talking about Cherry and what it felt like to have a "nigger" working in their department. She claims that on the following day, Ulven told her that he was brought up by his father, where the word "nigger" was used, and that "it just slips out sometimes." Cherry claims that she was told that over 95% of the employees at Menards were racist, and that her supervisor Ulven was a real racist and had been calling Cherry a "nigger" for a long time. On or about February 7, 1998, Cherry reported that she over-heard her co-worker Eric Williams tell another co-worker that she was a "black-bitch." On or about June 21, 1998, Cherry claims that the assistant manager Jon Kerns denied a price break to an Asian customer, because of his ethnicity, remarking "I hate those gooks." It was this final incident that Cherry claims forced her to quit because she could no longer endure such a hostile work environment. Cherry alleges that she reported these incidents of racial harassment to Menards and it did not respond to her complaints. In contrast, Menards claims that Cherry failed to report several of these incidents of racial harassment, however, when Cherry did report such incidents, Menards acted promptly in preventing further harassment. For example, Menards asserts that it reprimanded Engelman after Cherry reported his use of the phrase "nigger digger," and fired Glenn Clark after Cherry reported the phone incident in which he referred to Cherry as a "nigger."

Cherry also contends that because of her complaints, she was ostracized at Menards by other employees. She claims this is so because she was the only African-American employee at the Sioux City store, and that her supervisor, Mr. Kwallek told the employees to stay away from her. Thus, she claims that she was shunned as a result of her complaints. Moreover, specifically referring to her reporting instances of racial harassment, Cherry claims that Clark Ulven told her that he would promote her to assistant manager in the plumbing department if she did not report such incidents. However, Cherry claims that because she reported the incidents, Ulven retaliated against her by failing to promote her, and continuing to make racial comments and slurs such that Cherry was unable to continue to work in that environment.

## II. STANDARDS FOR SUMMARY JUDGMENT

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

Because this is an employment discrimination and retaliation case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford* ); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir.1997) (quoting *Crawford* ); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford* ); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir.1997) (quoting *Crawford* ); *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford* ); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford,* 37 F.3d at 1341); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford,* 37 F.3d at 1341); *Johnson,* 931 F.2d at 1244.

However, the Eighth Circuit Court of Appeals has also observed that, "[a]ll-

though summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134 (8th Cir. 1999) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied,* —— U.S. ——, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). Furthermore, "[s]ummary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her [or his] claim." *Snow,* 128 F.3d at 1205; *accord Helfter,* 115 F.3d at 615; *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995).

These special cautions seem to the court to be no less applicable here to plaintiff's retaliation and constructive discharge claims, because such claims also often depend upon inferences of the employer's motive, as is shown by application of the same burden-shifting analysis to retaliation claims as is employed in discrimination cases, *see Moschetti v. Chicago, Central & Pacific R. Co.,* 119 F.3d 707, 709 (8th Cir.1997) (The order and allocation of the burden of proof in [a retaliation case under 42 U.S.C. § 2000e–3(a)] is laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *accord Manning v. Metropolitan Life Ins. Co., Inc.,* 127 F.3d 686, 692 (8th Cir.1997); *Jackson v. Delta Special Sch. Dist. No. 2,* 86 F.3d 1489, 1494 (8th Cir. 1996), and the acceptance of inferential

proof of intent in constructive discharge cases. *See Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3d 349, 354 (8th Cir.1997) ("[I]n the absence of conscious intent [to force the employee to quit], the intention element may nevertheless be proved with a showing that the employee's 'resignation was a reasonably foreseeable consequence' of the [discriminatory or retaliatory conduct]," quoting *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 285 (8th Cir.1993)). The court will therefore keep these special cautions in mind while considering Cherry's motion for summary judgment.

## III. LEGAL ANALYSIS

### A. Cherry's Sexual Harassment Claim—hostile work environment

In this case, Cherry's first claim arises from the alleged sexual harassment she suffered at the hands of a Menards supervisor, Clark Ulven ("Ulven"), and non-supervisory workers at Menards, James Jepsen and Gene Smith. Cherry's claim is based on a hostile work environment. This court is cognizant, as are the parties, that an employer's liability for a claim based on hostile work environment sexual harassment differs depending on who does the alleged harassing. Therefore, the court will first analyze Menards's potential liability for supervisory harassment and determine whether summary judgment is appropriate on this claim. Then, the court will analyze Menards's potential liability for non-supervisory co-worker harassment and determine whether summary judgment is appropriate on that claim. However, the court must first determine whether Cherry has alleged a *prima facie* case of sexual harassment by her supervisors, co-workers, or both.[2]

---

**2.** On June 12, 2000, the Supreme Court, in *Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, 120 S.Ct. 2097, —— L.Ed.2d —— (2000), effectively abolished the co-called pre-text plus test recognized by a number of circuit court of appeals, including our own, *see Stanback v. Best Diversified Products, Inc.,* 180 F.3d 903 (8th Cir.1999) (holding, in a

two-to-one decision, that the pre-text plus test is the law of this circuit), at the third stage of the *McDonnell Douglas* burden shifting analysis. The *Reeves* Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of

### 1. Cherry's showing of the effect on her employment

Here, for purposes of this motion, Menards only challenges Cherry's ability to demonstrate the fourth element of her *prima facie* case—whether the conduct affected a term, condition, or privilege of her employment—as a matter of law. Therefore, the court will begin its legal analysis addressing the fourth element of Cherry's *prima facie* case for sexual hostile work environment.

 Menards asserts that Cherry is unable to show that the alleged harassment affected a term, condition, or privilege of her employment. This requirement has both objective and subjective prongs, and the offensive situation must offend a reasonable person as well as the plaintiff herself. *Carter*, 173 F.3d at 701. When the employment environment is objectively offensive, tangible injury on the part of plaintiff is certainly enough to show an alteration in the conditions of employment, but "even conduct that 'does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing their careers.'" *Smith v. St. Louis University*, 109 F.3d 1261, 1265 (8th Cir.1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Also, this requirement means "that the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Quick*, 90 F.3d at 1378 (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367). The Eighth Circuit Court of Appeals has made the following observations regarding the manner in which this element is to be evaluated:

Whether an environment is hostile or abusive cannot be determined by a "mathematically precise test"; it entails consideration of the entire record and all the circumstances. There is no particular factor that must be present, but conduct that is merely offensive is insufficient to implicate Title VII. *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Relevant considerations include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* A discriminatorily abusive work environment may exist where the harassment caused economic injury, affected the employee's psychological well-being, detracted from job performance, discouraged an employee from remaining on the job, or kept the employee from advancing in his or her career. *Quick*, 90 F.3d at 1378.

 Menards does not disagree that Cherry experienced crude comments and conduct, but it argues that mere offensive utterances and teasing in the workplace are not accorded legal redress under Title VII. Indeed, Menards argues that these crude comments and conduct were not severe and pervasive so as to alter a term or condition of Cherry's employment. Regarding the vulgarities uttered by Cherry's supervisor Clark Ulven, Menards asserts that Cherry did not report them to management because she ignored them, and further argues that Cherry's work performance did not suffer because these crude comments were not physically threatening or humiliating. Regarding the conduct of Cherry's co-worker Gene Smith, Menards argues that the incident was isolated, and that it did not prevent Cherry from performing well at her job, nor did if affect any term of her employment. Re-

fact to conclude that the employer unlawfully discriminated." *Id.*, —— U.S. —— at ——, 120 S.Ct. 2097, 2108. This court notes, however, that the present decision in this case

deals only with the first stage of the *McDonnell Douglas* burden shifting analysis, and therefore, this Supreme Court decision is mentioned merely for edification purposes.

garding the conduct and comments of Cherry's co-worker James Jepsen, Menards asserts that Cherry only reported one incident, and that it took preventive steps to prevent future harassment by Jepsen, which entailed an oral reprimand. Cherry disagrees, arguing that she was exposed to numerous sexually suggestive remarks at Menards, beginning with Ulven's crude statements, then proceeding to Jepsen's and Smith's crude remarks and gestures. Cherry contends that the incidents of sexual harassment that she endured were so severe as to alter a term or condition of her employment, so much so that she alleges that she was constructively discharged.

After considering the relevant factors, the court agrees with Cherry. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick,* 90 F.3d at 1377 (same). The record reflects that while Smith's crude remark and gesture occurred on one occasion, Ulven and Jepsen repeatedly made sexually suggestive remarks to Cherry. While the frequency of the alleged harassing conduct is only one consideration in the analysis, *see Quick,* 90 F.3d at 1378, the record is also replete with alleged instances of conduct that is severe. The court finds that a reasonable fact-finder could conclude that Jepsen's observations of Cherry's "nice ass," his dreams of having sex with Cherry and explaining what he would like to do to Cherry sexually, as well as Ulven's repeated discussions of his sexual activities [3], were so odious and demeaning that they are sufficiently severe to give rise to an actionable hostile work environment claim. Likewise, a reasonable fact-finder could reasonably conclude that Jepsen's grabbing Cherry around the waist, gabbing Cherry's butt, and kissing Cherry full on

the mouth, were physically threatening and humiliating. In light of these permissible findings, a jury could conclude that Jepsen's and Ulven's conduct unreasonably interfered with Cherry's work performance.

### 2. Employer liability for supervisory sexual harassment

#### a. The Ellerth/Faragher affirmative defense

In *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the United States Supreme Court clarified the employer liability standard for supervisory harassment of an employee under Title VII as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* FED.R.CIV.P. 8(C). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. As this court stated in *Green v. The Servicemaster Co.,* 66 F.Supp.2d 1003, 1010 (N.D.Iowa 1999), the threshold question for employer liability for supervisor harassment, is whether the plaintiff-employee suffered a tangible employment ac-

---

**3.** For example, Cherry alleges that Ulven stated that he "fucked" women in the ass and mouth.

tion. *See id.* If a supervisor's alleged sexual harassment of an employee culminates in "a tangible employment action such as discharge, demotion, or undesirable reassignment, the employer is vicariously liable to the employee." *Newton v. Cadwell Lab.,* 156 F.3d 880, 883 (8th Cir. 1998) (citing *Ellerth* and *Faragher*). If no tangible employment action is taken, the defending employer may raise the two prong affirmative defense subject to proof by a preponderance of the evidence. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

Here, Menards argues that Cherry did not suffer any tangible employment action. Menards asserts that the term constructive discharge, as used in *Ellerth* and its progeny, has been interpreted in many jurisdictions as not constituting a tangible employment action such as hiring, firing, demoting, or reassigning to an undesirable position. Therefore, Menards argues that because Cherry did not suffer a tangible employment action, Menards is entitled to assert the *Ellerth/Faragher* affirmative defense. In support of this argument, Menards relies primarily on a second circuit case entitled *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 294 (2nd Cir.1999), as well as several district court cases that follow the holding in *Caridad. See e.g. Scott v. Ameritex Yarn,* 72 F.Supp.2d 587, 594 (D.S.C.1999); *Powell v. Morris,* 37 F.Supp.2d 1011, 1019 (S.D.Ohio 1999) (finding it significant and dispositive that the Supreme Court in *Faragher* "explicitly defined tangible employment action as a discharge, demotion, or undesirable reassignment," and did not include constructive discharge); *E.E.O.C. v. Barton Protective Serv.,* 47 F.Supp.2d 57, 60 (D.D.C.1999); *Desmarteau v. City of Wichita, Kansas,* 64 F.Supp.2d 1067, 1079 (D.Kan.1999); *Alberter v. McDonalds's Corp.,* 70 F.Supp.2d 1138, 1147 (D.Nev. 1999). This court, however, does not agree with the decisions reached in *Caridad,* or the district court cases, which follow *Caridad.*

### b. Constructive discharge is a tangible employment action as defined in Ellerth and Faragher.

■ In *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283 (2d Cir.1999), a panel of the Second Circuit Court of Appeals held that "constructive discharge is not a tangible employment action warranting the imposition of strict liability under the *Ellerth/Faragher* standard." *Caridad,* 191 F.3d at 295. The panel in *Caridad* reached this conclusion for three reasons: (1) "[c]o-workers, as well as supervisors, can cause the constructive discharge of an employee"; (2) "unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer"; and (3) in *Ellerth,* the Supreme Court had "indicate[d] that constructive discharge is not a tangible employment action." *Id.* at 294. However, none of these reasons stands up to a probing scrutiny.

The first reason articulated by the panel in *Caridad,* that "[c]o-workers, as well as supervisors, can cause the constructive discharge of an employee," *id.,* is unpersuasive on two grounds. First, whether a co-worker can also cause a constructive discharge is irrelevant to what constitutes a "tangible employment action." The question of whether a constructive discharge constitutes a "tangible employment action" under *Ellerth* and *Faragher* would not arise unless the actor who caused the constructive discharge was a supervisor. *See Ellerth,* 524 U.S. at 759, 118 S.Ct. 2257 (explaining that, "[a]t the outset, we can identify a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate," then turning to the definition of a "tangible employment action"). Thus, in terms of whether the *Ellerth/Faragher* affirmative defense is triggered, courts deal only with the question of supervisor conduct—co-worker conduct is simply irrelevant to this question.[4]

4. Co-worker conduct that causes a constructive discharge is, of course, relevant to the

employer's liability for the constructive dis-

Second, the panel in *Caridad* asserts the wrong test for a "tangible employment action." In *Ellerth,* the Supreme Court explained that "[a] tangible employment action *constitutes a significant change in employment status,* such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (emphasis added) (citing cases). The Supreme Court also explained that "[a] tangible employment action in most cases *inflicts direct economic harm." Id.* at 762, 118 S.Ct. 2257 (emphasis added). Thus, the test of whether a constructive discharge is a "tangible employment action" is not whether it can be caused by a co-worker as well as a supervisor, but whether, when caused by a supervisor, it "constitutes a significant change in employment status," *Id.* at 761, 118 S.Ct. 2257, or "inflicts direct economic harm." *Id.* at 762, 118 S.Ct. 2257.

Indeed, in the paragraph of the *Ellerth* decision upon which the panel in *Caridad* relied as supporting its "co-worker/supervisor acts" distinction, the panel omitted the sentence defining tangible employment action in terms of action that "inflicts direct economic harm." *See Caridad,* 191 F.3d at 294. Thus, the pertinent paragraph of *Ellerth* states the following:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. *A tangible employment action in most cases inflicts direct economic harm.* As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. [Citations omitted]. But one co-worker *(absent some elaborate scheme)* cannot

> dock another's pay, nor can one co-worker demote another. *Tangible employment actions fall within the special province of the supervisor.* The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

*Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257 (emphasis indicating portions deleted from the quotation of this paragraph in *Caridad,* 191 F.3d at 294). Although the Supreme Court observed that "[t]angible employment actions fall within the special province of the supervisor," and that, "[a]s a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of harm," *id.,* the Court clearly recognized that there might be exceptions to this "general proposition." *See id.* at 762, 118 S.Ct. 2257 (recognizing that, under "some elaborate scheme," a co-worker could dock another's pay). Constructive discharge—if it inflicts the necessary harm—presents such an exception, because it can be the result of conduct by either co-workers or a supervisor. However, the question of whether a constructive discharge is a "tangible employment action" under the *Ellerth/Faragher* standard only arises if the constructive discharge was caused by the actions of a supervisor. *Id.* 760, 118 S.Ct. 2257.

To put it another way, the first rationale articulated by the panel in *Caridad* appears to be backwards: The panel in *Caridad* reasoned that a "tangible employment action" must be a harm that only a supervisor can inflict, when the Supreme Court defined "tangible employment action" in terms of the harm it can inflict, observed that ordinarily, but not exclusively, only a supervisor can inflict such harm, *see id.* at 761–62, 118 S.Ct. 2257, and then concluded that the "aided in the agency relation" standard "will always be met when a supervisor takes a tangible employment ac-

charge, but under the "knew or should have known" standard left undisturbed in *Ellerth* and *Faragher. See Ellerth,* 524 U.S. at 758–

59, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 799, 118 S.Ct. 2275.

tion against a subordinate." *See id.* at 762–63, 118 S.Ct. 2257. Consequently, this court concludes that, under the Supreme Court's definition, it is the *nature of the harm* inflicted by a supervisor—that is, "a significant change in employment status" or "inflict[ion] of a direct economic harm"—that determines whether the supervisor's action is a "tangible employment action," not whether a co-worker could also inflict such harm. *Id.* at 761–62, 118 S.Ct. 2257.

Applying the proper test, constructive discharge constitutes precisely the same sort of "significant change in employment status" and inflicts precisely the same sort of "economic harm" as any other "firing." *See, e.g., Spears v. Missouri Dep't of Corrections and Human Resources,* 210 F.3d 850, 854 n. 3 (8th Cir.2000) ("a constructive discharge may constitute an adverse employment action"); *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1016 (8th Cir.1999) ("Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard [of an adverse employment action under Title VII], *see [Cross v. Cleaver,* 142 F.3d 1059,] 1073 [(8th Cir.1998)], as would circumstances amounting to a constructive discharge, *see Parrish v. Immanuel Med. Ctr.,* 92 F.3d 727, 732 (8th Cir.1996)."); *see also Caridad,* 191 F.3d at 295 (acknowledging that the Second Circuit Court of Appeals had held that " 'when a constructive discharge is found, an employee's resignation is treated ... as if the employer had actually discharged the employee' ") (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987)). Thus, under the "significant change in employment status" or "inflict[ion] of direct economic harm" test of what constitutes a "tangible employment action," *Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257, a constructive discharge that results from the sexually harassing conduct of a supervisor should suffice to deprive an employer of the *Ellerth/Faragher* affirmative defense.

Nor is the second reason articulated by the panel in *Caridad* persuasive. The panel in *Caridad* reasoned that, "unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer." *See Caridad,* 191 F.3d at 294. That argument is apparently based on one rationale offered by the Supreme Court in *Ellerth* for its conclusion that a tangible employment action taken by a supervisor "becomes for Title VII purposes the act of the employer":

> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. [Citations omitted]. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes. [Citations omitted].

*Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257; *and compare Caridad,* 191 F.3d at 294 (quoting only the second sentence of the paragraph).

However, a "constructive discharge" that results from the sexually harassing conduct of a supervisor is no less the "act of the employer" than a firing, failure to promote, demotion, or reassignment. This is so, because, by definition, " '[a]constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable with the intent of forcing the employee to leave the employment.' " *Spears,* 210 F.3d at 854 (quoting *Knowles v. Citicorp Mortgage, Inc.,* 142 F.3d 1082, 1086 (8th Cir.1998)); *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir.1998); *Bergstrom–Ek v. Best Oil Co.,* 153 F.3d 851, 858 (8th Cir.1998). To show the employer's intent to force the employee to quit, "the employee's resignation must be a reasonably foreseeable consequence of the employer's discriminatory

action." *Phillips*, 156 F.3d at 890; *Bergstrom–Ek*, 153 F.3d at 858; *Knowles*, 142 F.3d at 1086. Actions of a supervisor may satisfy these requirements. *See, e.g., Bergstrom–Ek*, 153 F.3d at 858 (finding that actions of supervisory employees established the "intolerableness" and "intent/reasonable foreseeability" requirements of a constructive discharge). Thus, to assert that "an employee's constructive discharge is not ratified or approved by the employer," *see Caridad*, 191 F.3d at 294, overlooks the fact that a constructive discharge resulting from a supervisor's conduct is, legally, the employer's own "deliberate act." *See Spears*, 210 F.3d at 854; *Phillips*, 156 F.3d at 890; *Bergstrom–Ek*, 153 F.3d at 858; *Knowles*, 142 F.3d at 1086. As such, it should constitute a "tangible employment action" for which an employer is vicariously liable without entitlement to the *Ellerth/Faragher* affirmative defense.

Furthermore, as Chief Posner observed, in the sole reference to constructive discharge in the decision of the Seventh Circuit Court of Appeals in *Ellerth*,

> The difficult borderline case is that of constructive termination precipitated by a [supervisor's] threat [of retaliatory action for non-compliance with sexual demands or complaints about harassment]. The termination will look to the supervisor's superiors like a voluntary quit. But since there is always some paperwork involved in an employee's quitting, the higher-ups in the company will have some ability to monitor constructive discharges, and I would therefore impose strict liability in such cases.

*Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 515 (7th Cir.1997) (consolidated appeal with *Burlington Indus. v. Ellerth*) (Posner, Chief Judge, concurring and dissenting). Thus, the "imprimatur of the enterprise" and its "internal processes," *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257, are invoked in the case of a constructive discharge resulting from harassment by a supervisor, and the action is at least implicitly "ratified or approved by the employer." *Caridad*, 191 F.3d at 294. As

such, "constructive discharge" resulting from harassment by a supervisor should qualify as a "tangible employment action" by a supervisor under the *Ellerth/Faragher* standard.

The final rationale articulated by the panel in *Caridad* for holding that "constructive discharge" cannot constitute "tangible employment action" is its assertion that the Supreme Court itself "indicated" as much in *Ellerth*. *See Caridad*, 191 F.3d at 294–95. The panel in *Caridad* did not assert that the Court so "held" in *Ellerth*, but an "indication" from the Supreme Court that constructive discharge *cannot* constitute a "tangible employment action" would seriously undercut this court's conclusion that it *can*.

The panel in *Caridad* found this "indication" in the *Ellerth* decision from the fact that, even though the plaintiff in *Ellerth* alleged that her supervisor's harassment caused her constructive discharge, "in remanding the case for a determination of whether the employer could make out an affirmative defense, the Supreme Court noted that 'Ellerth has not alleged she suffered a tangible employment action at the hands of [her supervisor].' " *Id.* at 294 (quoting *Ellerth*, 524 U.S. at 746, 118 S.Ct. 2257). The Court's statement should also be read in conjunction with the Court's prior observation that, "[i]n the context of this case, a tangible employment action would have taken the form of a denial of a raise or a promotion," *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257, and the Court's recognition that Ellerth had pleaded that she was constructively discharged by her supervisor's harassment, but the district court had dismissed that claim. *See id.* at 748–49, 118 S.Ct. 2257.

However, whether Ellerth had adequately pleaded a constructive discharge and whether a constructive discharge, as a general proposition, can constitute a "tangible employment action" were never at issue before the Supreme Court, as neither question had ever been at issue before the Seventh Circuit Court of Ap-

peals. *See Jansen*, 123 F.3d at 490 (appeal consolidated with *Ellerth*). The Supreme Court's decision was thus premised on the assumption that "a trier of fact could find in [the supervisor's] remarks numerous threats to retaliate against Ellerth if she denied some sexual liberties," where the threats were to interfere with Ellerth's promotion or advancement, but "the threats ... were not carried out or fulfilled." *Ellerth*, 524 U.S. at 751, 118 S.Ct. 2257. The issue of the vicarious liability of the employer for a supervisor's conduct was not addressed in *Ellerth* in relation to conduct that led to a constructive discharge. Indeed, there is no mention of constructive discharge in relation to the specific comment of the Court that Ellerth had failed to plead a "tangible employment action," *see id.* at 766, 118 S.Ct. 2257, and no mention of constructive discharge elsewhere in the Court's legal analysis. Therefore, the *Ellerth* decision left entirely open the question of whether a constructive discharge resulting from conduct of a supervisor can constitute the sort of "tangible employment action" that deprives an employer of the *Ellerth/Faragher* defense.

For the reasons stated above, this court concludes that, contrary to the conclusion in *Caridad*, a constructive discharge resulting from sexually harassing conduct of a supervisor *does* constitute a "tangible employment action" within the meaning of the *Ellerth/Faragher* standard, and therefore would deprive an employer of the *Ellerth/Faragher* affirmative defense to vicarious liability. Similarly, this court also finds the district court cases cited by Menards in support of its assertion that a constructive discharge does not constitute a "tangible employment action" unpersuasive. The court notes that several of the district court cases cited by Menards rely on the same reasons advanced by the panel in *Caridad*. *See Scott v. Ameritex Yarn*, 72 F.Supp.2d 587, 594 (D.S.C.1999) (explaining that a constructive discharge is not a "tangible employment action," as that term is used in *Ellerth* and *Faragher*, because it is not an action made with the authority or approval of the employer); *Desmarteau v. City of Wichita, Kansas*, 64 F.Supp.2d 1067, 1079 (D.Kan.1999) (stating that the definition, rationale and application of tangible employment action in *Burlington* uniformly suggest that it refers only to employment actions directed by the supervisor); *Alberter v. McDonalds's Corp.*, 70 F.Supp.2d 1138, 1147 (D.Nev. 1999) (explaining that because a constructive discharge is not an official act of the enterprise it does not constitute a tangible employment action). As to the other district court cases, which advance different grounds for concluding that a constructive discharge does not constitute a "tangible employment action," the court is still not persuaded.

In *Powell v. Morris*, 37 F.Supp.2d 1011, 1019 (S.D.Ohio 1999), the district court concluded that a constructive discharge does not constitute a "tangible employment action" because in defining the term "tangible employment action," the Supreme Court did not mention constructive discharge as a "tangible employment action." *Powell*, 37 F.Supp.2d at 1019. The district court in *Powell* stated:

> If it had desired, the Supreme Court could have easily listed "constructive discharge" along with the other incidents as constituting a tangible employment action. That it did not do so implies that constructive discharge is not a tangible employment action.

*Id.* This court, however, does not find this argument persuasive, particularly because the court finds that the Supreme Court simply provided a non-exhaustive list of incidents that would constitute a "tangible employment action." This is so, because in *Ellerth*, the Supreme Court expressly preceded the list with the words "such as," thus suggesting that there would be other incidents, not listed, that would invariably constitute a "tangible employment action," thereby precluding the assertion of the *Ellerth/Faragher* affirmative defense. *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257.

Regarding the other district court case, *E.E.O.C. v. Barton Protective Serv.*, 47 F.Supp.2d 57, 60 (D.D.C.1999), this court notes that in reaching the conclusion that a constructive discharge "would not amount to a 'tangible employment action,'" the district court in *Barton* limited its holding "in the context of [that] case." *Barton*, 47 F.Supp.2d at 60. The district court in *Barton* emphasized that the plaintiff had waited eleven months before telling anyone at work about the harassment, stating:

> If the defendant may successfully defend by showing that the plaintiff unreasonably waited eleven months before telling anyone at work about the harassment, it makes no sense to permit the same eleven months of harassment to neutralize the defense.

*Id; see also Caridad*, 191 F.3d at 294 (emphasizing that the plaintiff did not complain of the harassment prior to quitting her job). The *Barton* case, however, is factually inapposite here, because Cherry allegedly complained to her supervisors about the harassing behavior before she alleges that she was forced to quit. The court finds significant that the district court in *Barton* expressly limited its conclusion in the context of that case, and, therefore, its holding does not foreclose the possibility that a constructive discharge could constitute a "tangible employment action" within the context of another case.

Indeed, the Eighth Circuit Court of Appeals has implied, or perhaps held, that a constructive discharge does constitute a "tangible employment action" as defined in *Ellerth/Faragher*. *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 889 n. 6 (8th Cir.1998). Specifically, the *Phillips* court stated:

> We note that no affirmative defense is available to an employer when a supervisor's harassment culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment. *Burlington Industries*, 524 U.S. at ——, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at ——, 118 S.Ct. at 2293. [Plaintiff] Phillips argues in connection with her constructive discharge claim

that she quit her job as a result of [her supervisor] Sonntag's harassment and her assignment to work some hours on a night shift. As we explain, *infra*, Phillips was not constructively discharged, nor did she suffer any other tangible detrimental employment action. The affirmative defense provided by *Burlington Industries* and *Faragher* is therefore available to [defendant] Taco Bell.

*Id.* The *Phillips* court noted that the affirmative defense was available to defendant Taco Bell because no constructive discharge or any other tangible detrimental employment action had occurred. In so doing, this court construes this language to signify that had Phillips been constructively discharged, such a discharge would have constituted a tangible employment action, thus precluding Taco Bell from asserting the *Ellerth/Faragher* affirmative defense. Consequently, the court finds that the Eighth Circuit Court of Appeals has at least implied that a constructive discharge can constitute a "tangible employment action" as defined in *Ellerth/Faragher*. *See also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 n. 5 (3rd Cir.1999) (recognizing that the constructive discharge in that case was a tangible employment action, which barred assertion of the *Ellerth/Faragher* affirmative defense); *accord Galloway v. Matagorda County*, 35 F.Supp.2d 952, 957 (S.D.Tx.1999) ("Constructive discharge qualifies as a tangible or adverse employment action."); *Lintz v. American Gen. Finance,Inc.*, 50 F.Supp.2d 1074, (D.Kan.1999) (the parties agreed that constructive discharge constitutes tangible employment action); *Jones v. USA Petroleum Corp.*, 20 F.Supp.2d 1379, 1383 (S.D.Ga.1998) (citation omitted).

Therefore, the court is not persuaded by Menards's argument, that a constructive discharge does not constitute a "tangible employment action" as defined in *Ellerth/Faragher*. Furthermore, it would create a strange incentive, indeed, if an employer could ensure the availability of the affirmative defense by forcing an em-

ployee to quit by making the employee's workplace intolerable. Accordingly, the court finds that if Cherry is able to establish that she was constructively discharged due to the harassing conduct of her supervisors, Menards would be precluded from asserting the *Ellerth/Faragher* affirmative defense. The court will discuss in further detail whether there exists a genuine issue of material fact regarding Cherry's constructive discharge claim in the following analysis pertaining to constructive discharge. Assuming, however, that the *Ellerth/Faragher* affirmative defense is available to Menards, the court must determine whether Menards is entitled to summary judgment on this affirmative defense.

#### c. *Application of the Ellerth/Faragher affirmative defense*

As indicated previously, the *Ellerth/Faragher* affirmative defense is potentially applicable here, because Cherry has alleged that she was sexually harassed by her supervisor, Clark Ulven, and because Menards argues that Cherry did not suffer a tangible employment action. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Again, the two elements of this defense are: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

█ To establish the first element of this defense, Menards must show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *See Phillips,* 156 F.3d at 889; *see also Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. In regard to this element, the Supreme Court has observed that "[w]hile proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may be appropriately addressed in any case when litigating the first element of the defense." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

Here, it is undisputed that Menards had in place a non-harassment policy in its employee handbook. However, Cherry asserts that she did not receive this handbook at the time she was hired on a part-time basis in July of 1997. It was only when she became a full-time employee in November of 1997 that Cherry claims she received the handbook. Notwithstanding, Menards contends that its policy clearly states that sexual and racial harassment is not tolerated at Menards, and that it provides for multiple mechanisms within its grievance procedure to bypass a possible supervisor's harassment by complaining to other personnel or higher-up management. Cherry argues that the question is not just whether Menards had a sexual harassment policy in place, but whether Menards's responses to Cherry's complaints were appropriate. Cherry alleges that when she did complain to Brad Kwallek, the store manager, concerning Ulven's alleged sexually harassing conduct, Kwallek called her "paranoid," and did not believe her allegations. She also alleges that Kwallek ordered the other employees to stay away from her. Cherry concedes that she did not report all of Ulven's sexually harassing behavior to Kwallek, but she claims that she did not report these other instances of sexual harassment to Kwallek because of his initial, inadequate response, which Cherry alleges did not prevent future harassment, and resulted in her ostracism. Under these circumstances, the court concludes that a genuine issue of material fact exists as to whether Menards exercised "reasonable care to prevent and correct promptly any sexually harassing behavior . . . ." *see Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Therefore, the court concludes that it will be for the jury to decide whether Menards's actions were sufficient to

satisfy this element of the affirmative defense.

Although the court has already concluded that summary judgment is precluded based on the disputed facts surrounding the first element of the affirmative defense, the court notes that fact issues also exist as to the second element. The second element requires Menards to prove that Cherry unreasonably failed to take advantage of any preventive opportunities provided by Menards or to avoid harm otherwise. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. The Supreme Court explained:

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Menards argues that because Cherry did not report her complaints about Ulven to management, she unreasonably failed to take advantage of the sexual harassment policy provided by Menards.

It appears to the court that Menards has ignored the alternative language in this element, namely "to avoid harm otherwise." Cherry did complain, and reported Ulven's conduct to Janelle Knight. Menards argues that Janelle Knight was a friend, and not the person to whom Cherry was supposed to report claims of sexual harassment. Cherry agrees that Knight was a friend, but Cherry emphasizes that Knight was also a manager at Menards. Therefore, Cherry stated that when she complained to Knight about the sexual harassment she believed that she reported her complaints to Menards. The court finds that a reasonable fact-finder could conclude that Cherry reported her complaints to Knight, because of Kwallek's alleged inappropriate and ineffective response, thereby generating a fact question

as to whether Cherry attempted "to avoid harm otherwise." Thus, even assuming that Menards is entitled to raise the *Ellerth/Faragher* affirmative defense to Cherry's alleged sexual harassment claims against Ulven, the court concludes that genuine issues of material fact preclude summary judgment on this claim of supervisory sexual harassment.

### 3. Employer liability for non-supervisory co-worker sexual harassment

■ In *Dhyne v. Meiners Thriftway, Inc.,* 184 F.3d 983, 987 (8th Cir.1999), the Eighth Circuit Court of Appeals recognized the distinction between harassment by supervisors and harassment by non-supervisory co-workers. Specifically, the *Dhyne* court stated:

> The Supreme Court recently discussed at length an employer's vicarious liability for a hostile work environment created by a supervisor. *See Burlington Ind., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). This is a different type of case because it involves harassment by a non-supervisory co-worker. Our court has long recognized that an employer may be directly liable for such harassment if it knew or should have known of the conduct and failed to take proper remedial action. *See Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1015–16 (8th Cir.1988).

*Dhyne,* 184 F.3d at 987. Therefore, to set forth a *prima facie* case of actionable hostile work environment harassment by non-supervisory co-workers, a plaintiff must establish the following five elements: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of her employment; and (5) that her employer knew or should have known of the

harassment and failed to take proper remedial action. *Austin v. Minnesota Mining & Mfg. Co.*, 193 F.3d 992, 993 (8th Cir.1999); *Carter v. Chrysler Corporation*, 1069 173 F.3d 693, 700 (8th Cir.1999); *Scusa v. Nestle, USA Company Inc.*, 181 F.3d 958, 964 (8th Cir.1999) (also construing elements of claim of sexual harassment under Title VII); *Caviness v. Nucor–Yamato Steel Co.*, 105 F.3d 1216, 1222 (8th Cir.1997); *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir.1996); *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 474 (8th Cir.1995). Consequently, the decisions in *Ellerth* and *Faragher* did not disturb the negligence standard that governs employer liability for a non-supervisory coworker's harassment. Having concluded previously that Cherry generated a genuine issue of material fact regarding the first four elements of her *prima facie* case based on a sexually hostile work environment, the court will now address the fifth element of her sexually hostile work environment claim by non-supervisory coworkers.

■ In order to establish her *prima facie* case of creation of a sexually hostile work environment by non-supervisory coworkers, Cherry must also show that Menards knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to stop the harassment. *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999) (citing *Bailey v. Runyon*, 167 F.3d 466, 468 (8th Cir.1999) and *Davis v. Tri–State Mack Distribs., Inc.*, 981 F.2d 340, 343 (8th Cir.1992)). "Once an employee complains to her employer about sexual harassment by a coworker, the employer is on notice and must take proper remedial action to avoid liability under Title VII." *Hathaway v. Runyon*, 132 F.3d 1214, 1223 (8th Cir.1997) (citing *Davis*, 981 F.2d at 343); *Zirpel v. Toshiba Am. Info. Sys., Inc.*, 111 F.3d 80, 81 (8th Cir.1997) (also finding an employer must take prompt remedial action after it knew or should have known of harassment). In addition to conducting an investigation, the employer must take " 'prompt remedial action rea-

sonably calculated to end the harassment.' " *Hathaway*, 132 F.3d at 1223 (again citing *Davis*, 981 F.2d at 343); *Zirpel*, 111 F.3d at 81 (the district court properly granted summary judgment in an employer's favor because the employer "promptly took 'remedial action … reasonably calculated to end the once it knew or should have known about a harassing co-employee's behavior' ", citing *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir.1993)). The employer cannot avoid liability by doing nothing simply because the co-worker denies that the harassment occurred. *Hathaway*, 132 F.3d at 1223 (citing *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir.1995)). Indeed, an employer may take remedial action even where a complaint is uncorroborated. *Id.* (citing *Knabe v. Boury Corp.*, 114 F.3d 407, 409, 413 & n. 11 (3d Cir. 1997)).

■ The promptness and adequacy of an employer's response will often be a question of fact for the fact-finder to resolve. *See Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir.1998); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 (8th Cir.1997); *Kopp*, 13 F.3d at 270. Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, compare *Bailey*, 167 F.3d at 468–69 and *Howard*, 149 F.3d at 843–44, with *Barrett v. Omaha Nat'l Bank*, 726 F.2d 424, 427 (8th Cir.1984), the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, *see Hathaway*, 132 F.3d at 1224, and whether or not the measures ended the harassment, compare *Zirpel v. Toshiba America Information Systems, Inc.*, 111 F.3d 80, 81 (8th Cir.1997), with *Smith*, 109 F.3d at 1265, *Baty v. Willamette Industries, Inc.*, 172 F.3d 1232, 1242 (10th Cir. 1999), and *Intlekofer v. Turnage*, 973 F.2d 773, 779–80 (9th Cir.1992).

■ There is evidence in the record that Cherry reported several instances of harassment to Menards's managers, namely Brad Kwallek, Clark Ulven and Janelle Knight. Cherry also alleged that Ulven over-heard Jepsen when he stated that he wanted to get together with Cherry, and was also present when Jepsen grabbed and kissed Cherry. Thus, Cherry alleges that Menards knew or should have known of Jepsen's harassing conduct. Cherry admitted that Ulven talked to Jepsen about his behavior, however, Cherry claims that Jepsen continued to sexually harass her anyway. As a result, Cherry claims that when Menards did respond, its response was inadequate because it failed to deter the alleged sexually harassing behavior. In contrast, Menards argues that it did not respond to many of Cherry's current allegations, because Cherry did not report many of the alleged instances of sexual harassment. Menards argues that when Cherry did report the alleged harassment, each claim was investigated, and the individuals were reprimanded for their inappropriate conduct. Thus, Menards argues that when Cherry reported the alleged sexually harassing behavior, its response was both prompt and appropriate. The court concludes that Cherry has generated a genuine issue of material fact as to whether Menards's response to her complaints regarding Jepsen were not sufficiently prompt or were not reasonably calculated to end the harassment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick*, 90 F.3d at 1377 (same). Therefore, Menards's motion for summary judgment on the ground that Cherry has failed to establish her *prima facie* case of a sexually hostile work environment created by non-supervisory co-workers is denied.

### B. Cherry's Racial Harassment claim-hostile work environment

Cherry's second claim arises from the alleged racial harassment she suffered at the hands of Menards supervisors Glenn Clark ("Clark"), Clark Ulven, Chris Mitchell ("Mitchell") and John Kerns ("Kerns") and Menards non-supervisory workers Eric Williams and William Engelman. Cherry also fashions this claim based on a hostile work environment. In *Gipson v. KAS Snacktime Co.*, 171 F.3d 574 (8th Cir.1999), the Eighth Circuit Court of Appeals stated that "the same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment." (citations omitted). *Id.* at 578. On this claim, Cherry alleges that both her supervisors and non-supervisory co-workers racially harassed her. As this court indicated previously under the sexual harassment claim, an employer's liability for a claim based on hostile work environment racial harassment differs depending on who does the alleged harassing. Therefore, the court will analyze Cherry's hostile work environment racial harassment claim as it analyzed Cherry's hostile work environment sexual harassment claim, beginning first with employer liability for supervisory racial harassment and then turning to employer liability for non-supervisory co-worker racial harassment. However, as in the sexual hostile work environment claim, the court must first determine whether Cherry has alleged a *prima facie* case of racial harassment by her supervisors, co-workers, or both.

### 1. Cherry's showing of the effect on her employment

■ Once again, for purposes of this motion, Menards only challenges Cherry's ability to demonstrate the fourth element of her *prima facie* case—whether or not the conduct affected a term, condition, or privilege of her employment—as a matter of law. Because the court explained in detail the requirements of the fourth ele-

ment in a *prima facie* hostile work environment claim previously in the sexual harassment section of this opinion, the court will not expound upon this element here. Suffice it to say that in determining whether a workplace environment was sufficiently hostile or abusive so as to affect a term, condition, or privilege of employment, the court looks at the totality of the circumstances, including "t' frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *See also White v. Honeywell, Inc.*, 141 F.3d 1270, 1275 (8th Cir.1998).

Menards does not disagree that Cherry experienced many crude unpleasantries regarding race, however, Menards argues that these incidents, collectively, were not so severe so as to alter a term or condition of Cherry's employment. Menards also asserts that it is undisputed that all the complaints made by Cherry were promptly addressed and remedied. In contrast, Cherry contends that the incidents of racial harassment that she endured were so severe as to alter a term or condition of her employment, so much so that she alleges that she was constructively discharged. Cherry also takes issue with Menards's contention that it promptly addressed and remedied all of her complaints, and, therefore, contrary to Menards's assertion, Cherry does dispute the adequacy of Menards's response to her complaints.

After considering the relevant factors, the court concludes that Cherry has generated a genuine issue of material fact that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive so as to alter the conditions of Cherry's employment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmov-

ing party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick*, 90 F.3d at 1377 (same). The record reflects that Cherry was called a "nigger" by Clark and Ulven. *See Delph*, 130 F.3d at 356 (stating that "the use of the word [nigger] even in jest could be evidence of racial antipathy.") (citing *McKnight v. General Motors Corp.*, 908 F.2d 104, 114 (7th Cir.1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991)); *see also Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir.1999) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (quoting *Rodgers v. Western–Southern Life Ins. Co. infra*); *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (stating that the word "nigger" is unambiguously racist and holding that its use on even a few occasions affects the terms and conditions of the plaintiff's employment severely enough to support a hostile work environment claim). Also, Ulven allegedly repeatedly, albeit not in her presence, referred to Cherry as a "nigger." *See Harris*, 510 U.S. at 21, 114 S.Ct. 367 (explaining that even if [the plaintiff] herself were not present or were not the target of some of [her supervisor's] racial remarks, a jury plausibly could find that his persistently offensive conduct created an overall "hostile or abusive environment," which exacerbated the effect of the harassment [the plaintiff] experienced individually). Furthermore, the record is replete with alleged instances of conduct that is severe. For example, the court finds that a reasonable fact-finder could conclude that Engelman's use of the term "nigger-digger" in a conversation with Cherry, Williams calling her a "black-bitch," teasing by Williams and Ulven about the term "sambo," the red "KKK" letters that were displayed on a grill, and the racial statements, such as "spics" and

"gooks," which were repeatedly used in Cherry's presence by Clark and Kerns, were so odious and demeaning that they are sufficiently severe to give rise to an actionable hostile work environment claim.

### 2. *Employer liability for supervisory racial harassment*

■ As noted in the court's analysis of Cherry's claim of hostile work environment sexual harassment, the absence of a tangible employment action enables an employer to avoid liability for a supervisor's harassment of a subordinate if the employer demonstrates that (a) it exercised reasonable care in preventing and correcting any harassing behavior and (b) the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities or to avoid harm otherwise.[5] Cherry asserts that although Menards had an anti-harassment policy in place, there is a genuine issue of material fact regarding the first element as to the appropriateness of the measures used by Menards to stop the pervasive hostile racial environment perpetrated by its supervisors. Also, Cherry asserts that there is a genuine issue of material fact regarding the second element of the affirmative defense as to whether she reasonably complied with Menards's anti-harassment policy.

As indicated previously, the Supreme Court has observed that while not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 ("While proof that an employer had promulgated an anti-harassment policy with

complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may be appropriately addressed in any case when litigating the first element of the defense."). Once again, Cherry does not dispute that Menards had an anti-harassment policy with a procedure for filing complaints. However, with respect to Clark, Cherry asserts that Menards's ultimate decision to fire Clark occurred too late in light of Menards's knowledge of Clark's repeated racist statements that Cherry alleges she and other workers had reported to management. Thus, Cherry asserts that reasonable minds could differ as to whether Menards should have done something with Clark before the phone incident, in which Cherry alleges that she was called "nigger," so as to prevent Cherry from suffering the racial harassment that she alleges she suffered at his hands for several months. Cherry further asserts that reasonable minds could differ as to whether Menards responded adequately by only terminating Clark for participating in the phone incident, and in failing to do anything to supervisor Mitchell, and only reprimanding Ulven. Lastly, Cherry asserts that reasonable minds could differ as to Menards's response to the alleged harassing conduct of Kerns, which Cherry alleges she reported to no avail. The court agrees. While it is perhaps true that Menards did respond to Cherry's complaints of racial harassment by her supervisors, the court concludes that there is a genuine issue of material fact in dispute as to the adequacy of Menards's response, and whether Menards's actions were sufficient to satisfy this element of the affirmative defense.

---

5. On pages 1171–77 of this opinion, the court concluded that a constructive discharge constitutes a tangible employment action within the meaning of *Ellerth/Faragher.* Accordingly, as the court explained under the section for employer liability for supervisory sexual harassment, if Cherry is able to prove that she was constructively discharged due to the harassing conduct of her supervisors, Menards

will be precluded from asserting the *Ellerth/Faragher* defense. *This is also true* regarding the analysis for employer liability for supervisory racial harassment. Thus, if Cherry is able to prove that she was constructively discharged due to the harassing conduct of her supervisors, Menards will be precluded from asserting the *Ellerth/Faragher* affirmative defense.

Having concluded that summary judgment is precluded based on the disputed facts surrounding the first element of the affirmative defense, the court need not determine whether disputed fact issues also exist as to the second element. Nevertheless, the court does note that disputed fact issues exist as to the second element as well. The second element requires Menards to prove that Cherry unreasonably failed to take advantage of any preventive opportunities provided by Menards or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. The Supreme Court explained:

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. Cherry asserts that she reported Clark's repeated racist statements to Janelle Knight. The court concluded earlier that there was a genuine issue of material fact in dispute as to whether Cherry's reporting the alleged sexual harassment to Knight was tantamount to reporting the conduct to Menards, and not merely, as Menards argues, telling a friend. Similarly here, the court finds that there is a genuine issue of material fact in dispute as to whether Cherry's reporting the alleged racial harassment to Knight was tantamount to reporting the conduct to Menards, and not merely telling a friend. Therefore, as the court explained previously, the court finds that a reasonable fact-finder could conclude that Cherry reported her complaints to Knight because of Kwallek's alleged response that Cherry was "paranoid" and his alleged statement to other employees to "stay away from [her]," thereby generating a fact question as to whether Cherry attempted "to avoid harm otherwise." Therefore, assuming that Menards is entitled to raise the *Ellerth/Far-*

*agher* affirmative defense to Cherry's alleged racial harassment claims against Clark and Ulven, the court concludes that genuine issues of material fact preclude summary judgment on this claim of supervisory racial harassment.

### 3. Employer liability for non-supervisory co-worker racial harassment

Having discussed at length the standard for employer liability for non-supervisory co-worker harassment in Cherry's sexual harassment claim, the court finds that a reprisal of that standard is unnecessary here. Suffice it to say, the court will employ the same standard and analysis here, in Cherry's racial harassment claim, as it did in Cherry's sexual harassment claim. In order to establish her *prima facie* case of creation of a racially hostile work environment by non-supervisory co-workers, Cherry must also show that Menards knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to stop the harassment. *Carter*, 173 F.3d at 702 (citations omitted). Cherry asserts that after she reported the KKK incident, Menards failed to take any action, much less "prompt" remedial action, and that she and a co-worker cleaned off the KKK letters that appeared on a displayed grill. Cherry also alleges that Menards did not investigate the matter to determine if one of its employees was responsible for writing those letters. Additionally, Cherry asserts that Menards's response to Engleman's use of the term "nigger-digger" was inadequate because he was neither written up nor reprimanded; rather, Cherry alleges that management only talked to Engleman, which Cherry alleges was not an adequate response. Regarding Williams calling her a "black-bitch," Cherry asserts that Kwallek responded by saying that Williams was just "playing," and when Cherry pressed the issue, Kwallek allegedly told her she was "paranoid." The court concludes that Cherry has generated a genuine issue of material fact that Menards's response to her complaints about

the KKK incident, and the comments allegedly made by Williams and Engelman, were not reasonably calculated to end the harassment. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick,* 90 F.3d at 1377 (same). Therefore, Menards's motion for summary judgment on the ground that Cherry has failed to establish her *prima facie* case of a racially hostile work environment by non-supervisory co-workers is denied.

### C. The Retaliation Claims

Cherry also contends that she was retaliated against by her supervisor, Clark Ulven, after she reported his use of racial comments and slurs to management. Specifically, Cherry alleges that Ulven told her that if she did not report his racial comments and slurs to Menards's management, he would promote her to assistant manager in the plumbing department. Cherry claims that because she reported Ulven's racial comments to management, not only was she not promoted, but the racial comments and slurs continued. Cherry also alleges that Ulven reassigned her working hours for one evening to a less desirable shift, and that she was ostracized and shunned by co-employees. Menards contends that Cherry was not retaliated against because Cherry was not denied a promotion. Also, the court understands that Menards construes Cherry's retaliation claim to consist of the following two adverse employment actions: (1) constructive discharge; and (2) failure to promote. The court, however, based upon Cherry's complaint and arguments in her resistance to the summary judgment, does not construe that Cherry's adverse

employment action constituting retaliation as constructive discharge. Rather, it appears that Cherry alleges that the retaliatory conduct—adverse employment actions such as failing to promote her, continuing with the racial comments and slurs, ostracism, and unilaterally reassigning her working hours to a less desirable shift after she reported Ulven's alleged racial harassment [6]—in addition to the alleged sexual and racial harassment to which she was subjected, caused her constructive discharge. Therefore, the court will limit its analysis regarding retaliation to Cherry's adverse employment allegations of failure to promote, shunning and ostracism, continuous use of racial comments and slurs, and job reassignment to a less desirable shift.

 To make a *prima facie* case on her retaliation claims under Title VII, 42 U.S.C. § 2000e–3(a), Cherry must establish the following: (1) she filed a charge of discrimination or engaged in other protected activity; (2) her employer subsequently took adverse employment action against her; and (3) the adverse action was causally linked to her protected activity. *Thorne v. Welk Inv., Inc.,* 197 F.3d 1205, 1210 (8th Cir.1999); *Scusa v. Nestle USA,* 181 F.3d 958, 968 (8th Cir.1999); *Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 818 (8th Cir. 1998); *Cross v. Cleaver,* 142 F.3d 1059, 1071 (8th Cir.1998) ("The elements of a claim of retaliation in violation of Title VII are the following: (1) the plaintiff filed a charge of harassment or engaged in other protected activity; (2) the plaintiff's employer subsequently took adverse employment action against the plaintiff; and (3) the adverse action was causally linked to the plaintiff's protected activity."); *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1245 (8th Cir.1998) ("There are three elements of a prima facie case in a Title VII retaliation claim: (1) the plaintiff en-

6. In its reply brief, Menards argues that because Cherry's allegation regarding reassignment was not pleaded nor ever referenced anywhere in Cherry's federal complaint, the court should not consider it. The court disagrees. The court points out that all that is required is notice pleading, and Menards was surely on notice of this allegation. At pages 136–37 of Cherry's deposition, Cherry unambiguously recounts this alleged incident.

gaged in statutorily protected activity; (2) the plaintiff suffered an adverse employment action; and (3) this adverse employment action occurred because the plaintiff engaged in statutorily protected activity."); *Manning v. Metropolitan Life Ins. Co., Inc.,* 127 F.3d 686, 692 (8th Cir.1997) ("To prevail on a retaliation claim brought under Title VII, § 42 U.S.C. § 2000e–3(a), an employee must show that (1) she filed a charge of discrimination; (2) the employer subsequently took adverse employment action against her; and (3) the adverse action was causally linked to the filing of the charge of discrimination.")

■ Once this prima facie showing is made, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and, if the employer meets that burden, the presumption of retaliation disappears. *Smith,* 151 F.3d at 817–18; *Coffman,* 141 F.3d at 1244 (citing *Jackson v. Delta Special Sch. Dist. No. 2,* 86 F.3d 1489, 1494 (8th Cir.1996)); *accord Manning,* 127 F.3d at 692; *Harris v. Secretary, U.S. Dep't of the Army,* 119 F.3d 1313, 1318 (8th Cir.1997); *Moschetti v. Chicago, Central & Pacific R. Co.,* 119 F.3d 707, 709 (8th Cir.1997) (explaining this burden-shifting analysis, citing *Rothmeier v. Investment Advisers, Inc.,* 85 F.3d 1328, 1332 (8th Cir.1996)); *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997). The fact finder is then "left to determine if [the employee] presented evidence capable of proving that the [employer's] proffered reasons for termination were a pretext for illegal retaliation." *Harris,* 119 F.3d at 1318; *accord Moschetti,* 119 F.3d at 709; *Montandon,·* 116 F.3d at 359. Here, however, Menards contends that Cherry cannot establish even her *prima facie* case of retaliation.

### 1. Cherry's evidence of "adverse action"

■ Regarding the first element, Menards assumes, without conceding, for purposes of this motion only, that Cherry was engaged in a protected activity when she complained of Ulven's racial harassment. Thus, the court will likewise assume that Cherry was engaged in a protected activity when she complained of Ulven's racial harassment. *See* 42 U.S.C. § 2000e–3(a). Menards takes issue with the remaining two elements, asserting that Cherry cannot demonstrate either an adverse employment action or causation.

In *Delashmutt v. Wis–Pak Plastics, Inc.,* 990 F.Supp. 689 (N.D.Iowa 1998), this court explained the "adverse employment action" element as follows:

"[N]ot everything that makes an employee unhappy is an actionable adverse action." *Montandon,* 116 F.3d at 359; *See also Manning,* 127 F.3d at 692 (quoting *Montandon* ). [T]he adverse action does not have to be a discharge, *see Manning,* 127 F.3d at 692 ("[A]ctions short of termination may constitute an adverse employment action within the meaning of [42 U.S.C. § 2000e–3(a)]."); *Kim,* 123 F.3d at 1060 ("[R]etaliatory conduct may consist of 'action less severe than outright discharge,'" quoting *Dortz,* 904 F.Supp. at 156), [but] the allegedly retaliatory conduct must nonetheless be " 'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or][c]hanges in duties or working conditions that cause no materially significant disadvantage." *Kim,* 123 F.3d at 1060 (some internal quotations and citations omitted) (citing *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994), and *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413, 1435 (S.D.Iowa 1994), aff'd, 61 F.3d 908 (8th Cir.1995) (table) (No. 94–4081)). In *Kim,* the Eighth Circuit Court of Appeals explained that what the court must look for is "the kind of serious employment consequences that adversely affected or undermined [the employee's] position, even if [s]he was not discharged, demoted or suspended." *Kim,* 123 F.3d at 1060. Furthermore, the court may examine the cumulative effect of the employer's allegedly retaliatory actions, rather than determining whether any individual ac-

tion upon which the claim relies was sufficiently adverse. *Id.*

*Delashmutt,* 990 F.Supp. at 699; *See also Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1245 (8th Cir.1998) (citing *Smith,* 109 F.3d at 1266) ("[N]ot . everything that makes an employee unhappy is an actionable adverse action.").

Here, Cherry contends that Ulven materially affected the conditions of her employment by telling her he would make her an assistant manager if she would stop complaining about him, and by unilaterally reassigning her working hours one evening to the less desirable night shift. Cherry alleges that she did not accept the terms of Ulven's so-called offer, and, as a result, she was not promoted. Cherry also argues that the ostracism and shunning that she suffered while at Menards because of her complaints buttresses her allegation that her working conditions were negatively affected by Ulven's and Menards's retaliatory behavior. In contrast, Menards asserts that Cherry's testimony reveals that Ulven did not offer Cherry a promotion as an inducement for her to not report him to management. Rather, Menards asserts that Cherry had already reported Ulven to management, and the offer for a promotion occurred later. Therefore, Menards argues that any failure to be promoted was due to Cherry's own refusal to accept it, and not due to Menards rescinding its offer to promote her.

The court is cognizant that the Eighth Circuit Court of Appeals has held that co-worker ostracism is not sufficient alone to rise to the level of an adverse employment action for purposes of Title VII. *See Scusa,* 181 F.3d at 969–70. However, the court finds that the cumulative effect of Ulven's and Menards's allegedly retaliatory actions, rather than determining whether any individual action upon which Cherry's claim relies, were sufficiently adverse to create a genuine issue of material fact. *Kim,* 123 F.3d at 1060. Cherry contends that not only was she not promoted to a position because she complained about Ulven's racial comments and slurs, but that he transferred her to a less desirable shift, albeit on only one occasion, and that the racial comments and slurs continued. *See Kim,* 123 F.3d at 1060 (sufficiently adverse actions include actions that disadvantage or interfere with the employee's ability to do his or her job). The court finds that based on the cumulative effect of these actions, and the ostracism and shunning that Cherry allegedly suffered because she reported the sexual and racial harassment, Cherry is able to generate a genuine issue of material fact that she suffered an adverse employment action. *See Scusa,* 181 F.3d at 969–70 (explaining that without evidence of some more tangible change in duties or working conditions that constitute a material employment disadvantage, general allegations of co-worker ostracism are not sufficient to rise to the level of an adverse employment action for purposes of Title VII). Furthermore, the court is not persuaded by Menards's assertion that, Cherry's testimony reveals that Ulven did not offer Cherry a promotion as an inducement for her not to report him to management. Menards is correct in the sense that Cherry had already reported the phone incident to Brad Kwallek that resulted in Glen Clark's discharge. However, Cherry also testified that the reason Brad Kwallek did not fire Ulven was because Kwallek allegedly told Cherry that it was Ulven's first time getting in trouble. Therefore, the court finds that there exists a genuine issue of material fact that Ulven did not want Cherry to report any other incidents in which he used racial comments and slurs to Kwallek, thus offering to promote Cherry if she remained silent, and ultimately refusing to promote Cherry because she did report his comments and conduct. *see Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick,* 90 F.3d at 1377 (same).

### 2. Cherry's evidence of causal connection

Menards also asserts that Cherry is unable to establish a retaliation claim, because she has failed to show a causal connection between the protected activity and an adverse employment action. *See Harris,* 119 F.3d at 1318. Here, there is evidence showing that because Cherry reported Ulven's racial comments and slurs to Menards, thus rebuking Ulven's offer of promotion, Ulven retaliated against her by not promoting her, continuing to use racial comments and slurs, and reassigning her to working hours on one evening to a less desirable shift. Accordingly, summary judgment in favor of Menards is not appropriate on this claim. *See* Fed. R. Civ. P. 56(c) (summary judgment may only be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").

### D. Constructive Discharge

### 1. Proof of constructive discharge

■ Because Cherry has generated a genuine issue of material fact that she was retaliated against with adverse employment actions, the court must also consider whether Cherry has generated a genuine issue of material fact that those adverse actions, as well as the sexual and racial harassment, led to her constructive discharge. To constitute a constructive discharge, a plaintiff must show more than just a Title VII violation by her employer. *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir.1998). A constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job. *Klein v. McGowan,* 198 F.3d 705, 709 (8th Cir.1999) (citing *Kimzey,* 107 F.3d at 574); *see also Johnson v. Runyon,* 137 F.3d 1081, 1083 (8th Cir.) (internal quotations omitted), *cert. denied,* 525 U.S. 916, 119 S.Ct. 264, 142 L.Ed.2d 217 (1998) ("A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employ-

ee to quit."); *Summit v. S–B Power Tool,* 121 F.3d 416, 421 (8th Cir.1997) (internal quotations omitted), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1185, 140 L.Ed.2d 316 (1998) (citing same). The intent element is satisfied by a demonstration that quitting was "a reasonably foreseeable consequence of the employer's discriminatory actions." *Id.* The employee has an obligation to act reasonably by not assuming the worst and not jumping to conclusions too quickly. *See Howard v. Burns Bros., Inc.,* 149 F.3d 835, 841–42 (8th Cir.1998).

■ " '[I]ntolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings.' " *Gartman v. Gencorp, Inc.,* 120 F.3d 127, 130 (8th Cir.1997) (quoting *Allen v. Bridgestone/Firestone, Inc.,* 81 F.3d 793, 796 (8th Cir.1996)). First, the conditions created by the employer must be such that a reasonable person would find them intolerable. *See Gartman,* 120 F.3d at 130; *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996); *Parrish v. Immanuel Medical Ctr.,* 92 F.3d 727, 732 (8th Cir.1996); *Allen,* 81 F.3d at 796; *Bradford v. Norfolk S. Corp.,* 54 F.3d 1412, 1420 (8th Cir.1995); *Smith,* 38 F.3d at 1460; *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 284 (8th Cir.1993). Second, the employer's actions "must have been deliberate, that is, they 'must have been taken with the intention of forcing the employee to quit.' " *Delph,* 130 F.3d at 354 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981)); *Gartman,* 120 F.3d at 130; *Tidwell,* 93 F.3d at 494; *Parrish,* 92 F.3d at 732; *Allen,* 81 F.3d at 796; *Smith,* 38 F.3d at 1461; *Hukkanen,* 3 F.3d at 284. The Eighth Circuit Court of Appeals has explained that, "in the absence of conscious intent ..., the intention element may nevertheless be proved with a showing that the employee's 'resignation was a reasonably foreseeable consequence' of the [discriminatory or retaliatory conduct]." *Delph,* 130 F.3d at 354 (quoting *Hukka-*

*nen,* 3 F.3d at 285); *Gartman,* 120 F.3d at 130 (also citing *Hukkanen*). Finally, "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly"; therefore, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir. 1995).

The Eighth Circuit Court of Appeals has affirmed constructive discharge verdicts, emphasizing the employee's lack of recourse within the employer's organization. For example in *Delph v. Dr. Pepper Bottling Co.,* 130 F.3d 349, 356–57 (8th Cir.1997), the Eighth Circuit Court of Appeals upheld a constructive discharge verdict based on a hostile environment. The *Delph* court held that the hostile environment was bad enough to constitute constructive discharge, because the harassment—racial slurs—came from the plaintiff's supervisor and the offending language was not only used in the plaintiff's presence, but was directed at him. *Id.* at 356. In *Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 574 (8th Cir.1997), the Eighth Circuit Court of Appeals emphasized management's indifference to the employee's complaints of hostile environment in affirming the plaintiff's verdict on constructive discharge: "If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge." *Id.* at 574.

### 2. *Cherry's evidence of constructive discharge*

 Menards claims that Cherry failed to prove that she was constructively discharged. Menards claims that Cherry failed to report many of the instances of sexual and racial harassment that she alleges occurred, and concerning the conduct that Cherry reported to management, Menards claims that it promptly investigated and remedied the harassment. Menards also claims that it could not have constructively discharged Cherry because it at-tempted to accommodate Cherry by offering to transfer her to a different store and by offering her a promotion because Cherry did not give Menards a reasonable chance to work out the problem.

The court concludes that Cherry has generated genuine issues of material fact precluding summary judgment in Menards's favor on her constructive discharge claim. As the court concluded earlier in this opinion, there exists a genuine issue of material fact as to the adequacy of Menards's response to Cherry's complaints of both racial and sexual harassment. Cherry's testimony that Menards either ignored or ridiculed her complaints, as well as the ostracism she alleges occurred as a result of her complaints, generate a genuine issue of material fact that a reasonable person would find that the conditions created by Menards were intolerable. *See Delph,* 130 F.3d at 356. Therefore, the court concludes that Cherry has succeeded in generating a genuine issue of material fact concerning her constructive discharge based on the intolerability of her working conditions due to the alleged sexual and racial harassment, as well as the alleged unresponsiveness of Menards's management. Specifically, the court finds that the racially charged nature of the comments, *see Delph,* 130 F.3d at 356, the sexually harassing behavior, and the retaliatory conduct that Cherry allegedly endured, are significant to a finding of constructive discharge. This situation alleges more than "a few isolated racial slurs," *see Delph,* 130 F.3d at 349 (citation omitted), as well as more than a few isolated instances of sexual harassment. Therefore, the court finds that the harassment that Cherry alleges was sufficiently severe or pervasive—both objectively and subjectively—to generate a genuine issue of material fact as to whether Cherry was constructively discharged due the harassing conduct of Cherry's supervisors and non-supervisory co-workers.

This is so despite Menards protestations that it attempted to accommodate Cherry by offering to promote and transfer her

because the court finds that Menards did not submit any evidence that it would investigate Cherry's complaints or try to ameliorate the situation or consider disciplinary action. *See Kimzey,* 107 F.3d at 575. Indeed, Cherry alleges that it is because of Menards's failure to respond to her complaints, to investigate the complaints, and to ameliorate the harassing behavior that rendered her working conditions so intolerable that she was forced to quit. *Cf. Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1160 (8th Cir.1999) ("[A] feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.") (quoting *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994)). In addition, regarding the issue of Menards's intent to force Cherry to quit, Cherry's evidence that Menards's manager Brad Kwallek, and assistant managers Janelle Knight and Dan Browning, ignored or ridiculed her complaints and requests to thwart the hostile work environment also generate a genuine issue of material fact as to whether resignation was a reasonably foreseeable consequence of the [retaliatory conduct]. *Delph,* 130 F.3d at 354 (quoting *Hukkanen,* 3 F.3d at 285.) As this court stated in *Delashmutt,* "[i]t is reasonably foreseeable that a person who finds all of her attempts to improve intolerable working conditions foreclosed will quit, rather than continue to suffer the intolerable conditions." *Delashmutt,* 990 F.Supp. at 703. Although Menards suggests that Cherry was too hasty in quitting her job, Cherry's evidence that she attempted to draw the problems to the attention of her supervisor and management, but her attempts were ignored, also generates a genuine issue of material fact as to whether she had given her employer "a reasonable chance to work out a problem." *West,* 54 F.3d at 498. If an employer refuses to hear and investigate complaints, an employee could reasonably believe that the employer will make no effort to work out the problem. Therefore, Menards is not entitled to summary judgment on Cherry's claim that she was constructively discharged. *See* FED. R. CIV. P. 56(c) (summary judgment may only be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.")

### IV. CONCLUSION

The court concludes that genuine issues of material fact preclude summary judgment on Cherry's sexual harassment hostile work environment claim, and racial harassment hostile work environment claim. Assuming that Menards is entitled to raise the *Ellerth/Faragher* affirmative defense to Cherry's hostile work environment claims based on sex and race at trial, genuine issues of material fact prevent judgment as a matter of law on that defense. The court also concludes that Cherry has established a *prima facie* case of retaliation, thus precluding summary judgment on this claim. Furthermore, the court concludes that Cherry has generated a genuine issue of material fact that she was constructively discharged because of the alleged sexual harassment, racial harassment, and retaliatory conduct of Menards. Therefore, Menards's motion for summary judgment is denied in its entirety.

**IT IS SO ORDERED.**